COMMONWEALTH *vs.* WILLIAM MEDINA.

Middlesex.    February 8, 1977. — June 16, 1977.

Present: HENNESSEY, C.J., KAPLAN, WILKINS, LIACOS, & ABRAMS, JJ.

*Practice, Criminal,* Directed verdict, Disclosure of evidence.   *Evidence,* Opinion: expert; Demonstration.   *Witness,* Expert witness.   *Homicide.*

At a murder trial, there was no error in the admission of certain ballistics tests by an expert for the Commonwealth which were not disclosed to the defendant pursuant to a pre-trial order where the defense had opportunity to inspect and copy the test results and where the defendant's own ballistician gave testimony not different in substance from that of the Commonwealth's expert based on the tests. [777-780]

At a murder trial, the judge did not abuse his discretion in admitting the opinion of a medical examiner as to the incapacitation of the victim after she received any one of the five gunshots and as to the

range at which two of the shots were fired; nor was there error in the admission of an opinion of a Commonwealth fingerprint expert that the direction and position of the prints on the murder weapon did not comport with its being fired from an inverted position. [780-782]

At a murder trial, the judge did not abuse his discretion in refusing to allow the defendant to give a demonstration for the jury which could not have replicated the circumstances of the actual event. [782]

Evidence at a murder trial warranted a finding that the defendant was guilty of murder in the second degree. [782-783]

INDICTMENT found and returned in the Superior Court on October 10, 1974.

The case was tried before *Lappin, J.*

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Donald L. Conn* for the defendant.

*Peter W. Agnes, Jr.,* Assistant District Attorney (*Sheila Ryan,* Legal Assistant, with him) for the Commonwealth.

KAPLAN, J. On trial for the murder of his wife, the defendant moved at the close of the Commonwealth's case for a directed verdict of acquittal. The motion was granted, as to so much of the indictment as charged murder in the first degree, for the reason that there was insufficient evidence of premeditation. On the whole case, the jury found the defendant guilty of murder in the second degree, and from the judgment of conviction this appeal is taken pursuant to G. L. c. 278, §§ 33A-33H. Only six of the twenty-two assignments of error are argued, and the rest are thereby abandoned.

1. *The evidence.* (a) Commonwealth's case. Returning home with the defendant from a visit to the hospital where two of their children were ailing, the wife Luz Medina invited a neighbor, Mrs. Mariafrancis Sabella, and Mrs. Sabella's daughter, Michelle, to play dominoes at the Medinas' apartment. Mrs. Medina and the Sabellas spent most of the evening after 8 P.M. playing the game in the living room, while the defendant, on a couch placed against the wall of the room, spoke intermittently with the players, going occasionally to the kitchen for drinks. Around

Commonwealth *v.* Medina.

11 P.M. Mrs. Medina excused herself to take a bath. She returned, having changed into a night robe. After playing a final game, Mrs. Sabella and Michelle left and went to their apartment across the street. Mrs. Sabella had observed nothing unusual in the conversation between the defendant and his wife, nor in the latter's mood: she was "happy" and "joking and teasing, the way she would normally."

Some ten minutes after Mrs. Sabella reached her apartment, she heard the defendant calling her. She rushed to the balcony of her apartment and saw the defendant standing on the sidewalk. He said someone was "dead." Mrs. Sabella dressed hurriedly and ran to the hallway of the Medina apartment house. It was now 12:10 or 12:15 A.M. The defendant was sitting on the hall steps, weeping and saying in a mixture of Spanish and English, "My Lucie, my Lucie, why did she do it? . . . She said I don't love her anymore and I wanted somebody younger and she went in the cupboard and she got out the gun and she shot herself." Responding to questions, he said he didn't know how many shots were fired; "[s]he just kept shooting." He had been sitting on the couch when the shooting started; she fired the first shot when she was in the kitchen.

Taken to the hospital, the defendant gave the same account, but left it unclear where his wife was when she fired, first indicating the kitchen, then the living room. He said he tried to get off the couch but because of his bad back trouble he could not reach her in time. He had telephoned the police immediately and gone outside to Mrs. Sabella's apartment house.

As found by the police on entering the Medina apartment — they had arrived on the scene even before Mrs. Sabella — Mrs. Medina was dead, lying on her back straddling the passage between the living room and kitchen, her head and most of her body in the living room and her feet in the kitchen. She had received five wounds in the chest from a .22 caliber rifle. (The arrangement of the living room was the same as earlier that night except that

a second couch had been converted into a bed: the defendant testified that his wife had prepared the bed after the guests left, just before the alleged suicide.)

That the deceased had turned the rifle on herself was put in question by the physical evidence developed through testimony of the police officers on the scene, the medical examiner, and ballistics and fingerprint experts.

The end of the stock of the rifle was near the deceased's head, with the barrel pointed toward her feet, extending slightly beyond her knee. Discernible fingerprints on the upper and lower portions of the stock, not sufficiently clear to allow positive attribution, were so placed as to be inconsistent (in the view of the prosecution's fingerprint expert) with the supposed suicide. The distance from trigger to muzzle of this rifle was almost twenty-seven inches, while the measurement from the deceased's armpit to elbow and from elbow to center of the palm of the hand was only twenty-one inches. (The deceased was five feet, three inches, in height.) Although there was blood about her face, upper chest, and hands, no blood was found on the rifle except for a small spot on the end of the barrel.

The bullets had entered the upper chest within a small radius of two inches. It was not possible to relate each entrance to an exit, but the entrance sites were all higher than the exits, indicating downward angles of fire; two of the exit wounds also indicated side angles of fire. Each shot passed through a vital organ and was potentially fatal;[1] each would have incapacitated the deceased in the sense of inducing instantly a condition of primary or neurogenic shock. How, then, could she fire four further shots from a rifle weighing five and three-quarter pounds, each shot requiring a separate pull of the trigger (the rifle being semi-automatic) with at least six and one-half to seven and one-half pounds of pressure.

---

[1] Two bullets had gone completely through the ascending aorta. One had gone through the base of the heart and into the descending aorta. Another went through the pericardium (lining of the heart), then veered and passed through the left side of the heart into the left lung. Another had penetrated the lung.

Some inferences could be drawn from the locations of two discharged projectiles (the other three were captured by the body), of a trail of blood, and of the cartridge casings. One projectile was found four feet up the kitchen wall about six feet from the feet of the deceased, and blood appeared on a potato sack directly below this breach in the wall. A trail of drops of blood ran from the middle of the kitchen floor into the living room, in a line with the body and extending to the left knee. The other projectile was clinging to the back of the night robe; immediately beneath were holes through the rug and linoleum and an indentation in the wooden floor. Thus it appeared that at least one shot was fired while the deceased was in the kitchen, and at least one while she was lying on her back across the entrance. One cartridge casing was found just inside the door of a small bedroom off the rear of the kitchen; the other four in the living room, of which three were located between the head of the deceased and the converted couch, the fourth on that couch. As the rifle ejected casings on its right side, at a slight rearward angle, it was probably pointed toward the kitchen when firing and discarding the four casings. A plausible reconstruction of the episode would have the deceased shot once in the kitchen, staggering and falling on the floor, and receiving four more bullets from the rifle held by the defendant standing above and slightly behind the deceased's head as she lay there — a rifle stance consistent with the downward angle of the shots. Alternatively (but less plausibly), up to three shots were received while the victim was staggering and falling. The location of the casings, among other indicia, added to the improbability of the deceased's firing five shots while holding the rifle inverted upon herself.

Powder pattern evidence offered by the prosecution was rather equivocal. Adhering to two of the chest wounds were small particles of gunpowder, and the edges of these wounds were jagged and burned, all indicating (in connection with tests conducted by the Commonwealth, referred to further below) that the shots were fired at close range, not more than six inches from the body. No par-

ticles could be found on the other three wounds, leaving the alternatives that these shots had been fired either from a distance of not less than eighteen inches, or with the weapon pressed against the chest.

(b) *Defendant's case.* A ballistician testified that a pressure of eight to eight and one-half pounds would be needed to pull the trigger, that two shots were fired with the muzzle touching but not pressed tightly against the chest, and the other three with the muzzle so pressed or at a distance of more than two feet. From the fact that none of the other persons in the apartment house at the time was called to testify, the defense suggested that none heard the shots and therefore the rifle had been pressed to the chest so that the sound would be muffled. As to the location of the casings, the expert said that when ejected from this kind of rifle and hitting the floor, the casings would scatter somewhat erratically. He thought it would take only five to ten seconds to fire five times.

A pathologist testified on the part of the defendant that even after the fifth shot the victim, with her brain still physically intact, might have retained consciousness for thirty to sixty seconds and been capable of "some kind of physical effort" — she could walk, use her arms, and probably talk. As to the measurements from the armpit, the witness said the shoulder girdle is flexible and allows a person to reach up to six inches beyond the stationary distance "by simply rotating the shoulder blade" without moving the chest.

Testimony by the defendant himself was directed to showing that he in fact had back trouble. He was now unsure where his wife was standing when she fired the first shot, and he did not actually see her fire. He said she had had some experience firing that weapon.

2. *The exceptions.* (a) Admission of certain ballistics tests. The distance of the muzzle of the rifle from the body when fired was, of course, an important factor in the case. On this the Commonwealth offered evidence through a ballistics expert of the results of "powder pattern tests" carried out by firing the fatal rifle at varying distances

into white cloth to determine the patterns of burned and unburned particles of powder left on the surfaces and then making comparisons with the patterns observed around the actual wounds. The defense objected to the offer for failure of the Commonwealth to comply with the court's pre-trial order that the Commonwealth should permit the defendant to inspect and copy the results of any scientific tests made in the case that were within the Commonwealth's control and of which its counsel became, or should reasonably have become aware. Suspending the trial proper, the judge conducted a short hearing on the matter and then overruled the objection. The defendant excepted, and urges the point on appeal.

It was within the intention, if not the precise text of the pre-trial order that the Commonwealth should inform defense counsel of any test made so that inspection or copying could occur.[2] The Commonwealth did not take unequivocal affirmative steps to do this. But there was a near equivalent. The ballistician who later testified for the defense at trial visited the laboratory of the firearms identification bureau of the Massachusetts State police, where the tests had been carried out, to inspect on behalf of the defense the physical evidence held there. He was given the run of the laboratory (he had been a member of the bureau for fifteen years and its supervisor for five of those years). He saw the tests in question in just the form in which they were presented at the trial, and knew they were fully available to the defense. Yet he did not pass the word to defense counsel. Explaining this omission, he said he thought the tests were incomplete as no chemical analysis had been made (to locate nitrates or gases released on firing). But there was testimony that that kind

---

[2] The defendant's motion, granted by the court, was "to direct the Commonwealth to permit the defendant to inspect and copy results or reports of physical or mental examinations and of scientific tests or experiments made in connection with the particular case, or copies thereof, within the possession, custody or control of the Commonwealth, the existence of which is known, or by the exercise of due diligence may become known to the attorney for the Commonwealth."

of analysis was very rarely applied; none was intended here and no such analysis was presented at trial.

The defendant tries to fit these facts within the doctrine associated with *Brady* v. *Maryland,* 373 U.S. 83 (1963) — that official withholding of material evidence after request by the defendant violates due process.[3] See *Commonwealth* v. *Pisa, ante,* 590, 593-597 (1977). *Commonwealth* v. *Dabrieo,* 370 Mass. 728, 742-743 (1976); Annot., 34 A.L.R.3d 16 (1970). It may be enough to say that the judge concluded here on sufficient evidence that there was not "any failure on the part of the Commonwealth to comply with the spirit of this motion" as the defense had opportunity to inspect and copy the test results. At worst, the judge indicated, there was mutual negligence or inadvertence. That is far removed from the typical *Brady* violations invoking the Constitution. See *People* v. *Hudson,* 38 Ill. 2d 616, 623-624 (1968); *State* v. *Cook,* 242 Ore. 509, 517-518 (1966). Cf. *People* v. *Petersen,* 188 Cal. App. 2d 46, 49-50 (1961). Moreover, this was not evidence favorable to the defendant held back from trial as in the *Brady* line of cases; it was offered by the Commonwealth as part of its case. Thus the grievance could be only that the defense was handicapped in repelling the test evidence. Such a situation has not been viewed as falling under the *Brady* rationale. See *United States* v. *Agurs,* 427 U.S. 97, 112 n.20 (1976). But, even if *Brady* were thought relevant, there was nothing approaching a demonstration that earlier access would have enabled counsel to do more to meet the test evidence; it is suggestive that the defense did not seek a continuance at the time. All this points up the want of "materiality" in the sense of *Brady*; that is, the improbability that full cooperation of the prosecution with

---

[3] In a typical *Brady* situation "[t]o demonstrate constitutional error three elements must be shown: (a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence." *Commonwealth* v. *Gilday,* 367 Mass. 474, 487 (1975). See *Moore* v. *Illinois,* 408 U.S. 786, 794-795 (1972). (Other situations within *Brady* are discussed in *United States* v. *Agurs,* 427 U.S. 97, 103-107 [1976].)

defense counsel would have resulted in a better defense case that would have impressed the jury.[4] To cap this matter, we note that the testimony on the distance factor given by the defendant's own ballistician did not differ in substance from that of the Commonwealth's expert based on the tests.[5]

Quite apart from *Brady*, a case can be made out for a new trial where the prosecution, contrary to a discovery order, has failed to make incriminating evidence available to the defendant before trial, and the defendant is thus prejudiced in responding to it. But, as indicated, on the present facts the defendant can benefit as little from that kind of authority as from *Brady* itself. Compare *United States* v. *Allsenberrie*, 424 F.2d 1209, 1215 (7th Cir. 1970); *Hansen* v. *United States*, 393 F.2d 763, 769-770 (8th Cir.), cert. denied, 393 U.S. 833 (1968); with *United States* v. *Kelly*, 420 F.2d 26, 28-29 (2d Cir. 1969); *United States* v. *Padrone*, 406 F.2d 560, 561 (2d Cir. 1969). See also Fed. R. Crim. P. 16.

(b) Testimony by experts. The chief pathologist at Framingham Union Hospital, serving as associate medical examiner for Middlesex Eighth District, who had performed the autopsy, was permitted to state his opinion that "at least two of the shots were at close range" and that any one of the wounds would have "medically incapacitated" the deceased, causing "immediately" a "form of shock called primary or neurogenic shock." By two

---

[4] We need not go into the refinements of this subject expounded in *United States* v. *Agurs, supra* at 103-104, 108-114.

[5] To expand somewhat on the testimony mentioned above: The Commonwealth's expert testified that two of the wounds resulted from shots fired while the muzzle tip was not more than six inches from the body. On cross-examination he said he was speaking conservatively. The patterns on the two wounds were consistent with the test patterns at one or two inches or at loose contact. The remaining three shots were fired at a distance of more than eighteen inches or while the muzzle was pressed tightly against the skin. The defendant's ballistics expert testified that two wounds were received while the rifle was slightly touching the skin. The other three shots were fired either from a distance of over twenty-four inches or while the muzzle was pressed tightly against the skin.

exceptions the defendant questions whether the witness's expert knowledge extended to these matters. There was no doubt about the strength of the doctor's qualifications as a forensic pathologist, and he had had some though not extensive experience with gunshot wounds encountered in autopsies. The judge's discretion certainly was not abused in admitting the testimony about incapacitation. See *Commonwealth* v. *Capalbo,* 308 Mass. 376, 379-380 (1941) (medical examiner permitted to testify as to the manner in which the deceased would have dropped when shot); *Commonwealth* v. *Russ,* 232 Mass. 58, 78 (1919) (doctor permitted to testify that no struggle took place on the part of the deceased and that death occurred where the body was found). Neither do we think there was error in receiving the witness's remark, based on experience and observation fortified by medical knowledge, about the two gunshot wounds. See *Commonwealth* v. *Bellino,* 320 Mass. 635, 637-638, cert. denied, 330 U.S. 832 (1947) (doctor who had examined fourteen bodies where death resulted from gunshot wounds permitted to testify that gun was directly on the skin when the bullet was fired into the victim). In all events, as we have seen, the ballistics experts on both sides gave substantially similar testimony on the distance factor. We should add that the jury were properly told that they need not necessarily credit expert testimony but were to evaluate it with the rest.

Taking the opposite line, the defendant excepted to the admission of the opinion of a Commonwealth fingerprint expert that the direction and position of the prints on the rifle did not comport with its being fired from an inverted position,[6] the defendant's argument being that any infer-

---

[6] Counsel's objection was not timely made; he waited until after the answer had been given and then objected and moved to strike the answer. See *Commonwealth* v. *Geagan,* 339 Mass. 487, 513, cert. denied, 361 U.S. 895 (1959); *Commonwealth* v. *Doyle,* 323 Mass. 633, 634-635 (1949). Like the parties, we prefer to overlook this difficulty and speak to the merits. Cf. *Commonwealth* v. *Lewis,* 346 Mass. 373, 380 (1963), cert. denied, 376 U.S. 933 (1964).

ence on the point was a matter of common sense for the jury and not a question on which an expert could have a judgment of particular value. Again we think there was room for the judge's ruling when taken together with his instructions to the jury. See *Commonwealth* v. *Makarewicz,* 333 Mass. 575, 591 (1956) (fingerprint expert permitted to give "opinion of the position the defendant must have been in to place his fingerprints on the fenders of the automobiles where they were found").

(c) *Proposed demonstration for the jury.* With respect to his contention that gunshots at a distance from the body would probably have been heard by persons in the apartment building, the defendant moved that the jury be exposed in the court house to the sounds made by firing the rifle from varying distances into a pail of sand. Yet again we have a matter lying in discretion, and we cannot say the judge committed error in deciding that the jury would not be helped significantly by a demonstration that could not have replicated the circumstances of the actual event. See *Commonwealth* v. *Flynn,* 362 Mass. 455, 473 (1972); *Commonwealth* v. *Burke,* 344 Mass. 243, 247 (1962).

(d) *Refusal of directed verdict.* Neither at the close of the Commonwealth's case (see *Commonwealth* v. *Kelley,* 370 Mass. 147, 149-150 [1976]), nor at the close of all the evidence, was the defendant entitled to a directed verdict on the charge of murder in the second degree. The defendant contends that the proof was in exact balance between guilt and innocence (a condition rarely met with in real life), but we think the judge fairly decided at each stopping place in the trial that a jury could find with reason that guilt had been established beyond a reasonable doubt. See *Commonwealth* v. *Earltop, ante,* 199, 201 (1977); *Commonwealth* v. *Sandler,* 368 Mass. 729, 740 (1975); *Commonwealth* v. *Montecalvo,* 367 Mass. 46, 54-55 (1975). The testimony of Mrs. Sabella did not picture Mrs. Medina as a woman on the edge of self-destruction. Mrs. Medina's hands were found bloodied, but not the rifle. The butt of the rifle was at her head. Detectable prints sug-

gested that the rifle was not inverted when fired, and arm's length measurements strengthened that conclusion. That the victim might fire all five shots despite the grievousness of her wounds was less than plausible. One shot, at a minimum, was shown with considerable probability to have been fired when the victim lay on her back. There was proof of movement by the victim after the first shot and the jury could well decline to credit a theory that she shot herself in the kitchen and then shot herself repeatedy as she was stumbling backward into her final position.

Examining the whole record as required by G. L. c. 278, § 33E, we find no reason to mitigate the results of the jury verdict and conviction.

*Judgment affirmed.*