COMMONWEALTH *vs.* BARIKI S. SEIT.

Middlesex.    December 7, 1976. — July 19, 1977.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & LIACOS, JJ.

*Homicide.  Witness,* Expert: opinion, qualification.  *Evidence,* Expert witness, Threat, Reputation.  *Self-Defense.  Practice, Criminal,* Judicial discretion, Capital case.

A judge did not err at a murder trial in allowing a pathologist called by the Commonwealth to testify with respect to the spinning effect on the victim of a gunshot wound nor did he err in excluding the opinion of a ballistician called by the defense on the same subject. [91-92]

Commonwealth *v.* Seit.

Evidence at a murder trial warranted a finding of murder in the second degree. [93]
Upon consideration of the evidence in a case of homicide by shooting, a conviction of second degree murder was reduced to manslaughter in the interest of justice pursuant to G. L. c. 278, § 33E. [93-95]

INDICTMENT found and returned in the Superior Court on August 8, 1973.

The case was tried before *R. Sullivan,* J., and a motion for a new trial was heard by him.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Bruce N. Sachar (Joseph J. Machera* with him) for the defendant.

*Peter W. Agnes, Jr.,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J.    On an indictment charging murder in the first degree of Bari Pogoni, a jury found the defendant Bariki S. Seit guilty of murder in the second degree, and he takes his appeal here from the judgment of conviction (and from the denial of his motion for a new trial) pursuant to G. L. c. 278, §§ 33A-33G. We shall conclude that there was no error warranting reversal of the judgment, but that we should exercise our power under § 33E to reduce the verdict to manslaughter.

1. *Commonwealth's evidence.*    The Commonwealth presented evidence that about noon of June 26, 1973, the defendant appeared at the Lynn police station and — nervous and upset, but speaking in subdued tones — said he wanted to be locked up, he had just killed his partner. On being patted down, he said the gun was in his car parked outside. An officer accompanied him to the car. A Remington .380 semi-automatic pistol was lying on the front seat; under the seat was a Smith & Wesson, .357 magnum revolver (model 19). The defendant indicated he had used the revolver in the shooting. Walking back to the station, he volunteered that he had done it because his partner had stolen a gun belonging to him (a statement he later re-

peated to officers inside), and that he had been driving around all morning wanting to kill himself but hadn't been able to get up the courage. While being given his Miranda rights he reiterated that he had done it, he didn't need a lawyer. He also said he had shot his partner four times. On inspection, the revolver was found to contain in the cylinder four spent cartridges and two live rounds; the pistol had one live round in the chamber and five more in the magazine.

Relayed to the Cambridge police was the defendant's further statement that the body was in the "back room" of the place of business, "Barry's Sub Shop" at No. 4 Central Square, Cambridge. Arriving at that location, Cambridge police found the front and rear doors locked, with a key inside the front-door lock. They entered with force, walked the length of the store proper, which appeared undisturbed, and continued into the kitchen which took a turn to the right and opened to a storage area with a rear door to the right. In the kitchen area just beyond the right turn was the victim's body, lying face down, right cheek to the floor, head toward the storage space.

The pathologist who performed the autopsy found two gunshot wounds: a flesh wound about 3.5 centimeters above the right eye-brow, entrance-exit holes less than one inch apart, not involving bone or brain, but with some surrounding abrasion and contusion; a mortal wound caused by a bullet entering the back of the neck and exiting from the left upper neck just below the jaw, perforating in its course the cervical spine and lacerating the left carotid artery.

The wound at the right forehead must have been inflicted before the wound through the neck. From the former wound itself, the pathologist could not say which end of the channel in the forehead the bullet had entered, and thus he could not judge whether the weapon had been discharged with the victim facing or turned away from it. The witness was asked by the prosecution to take into account the fact (testified to by others) that spent projectiles and lead fragments had been recovered from the

storage area; he then said he thought the bullet had entered the forehead area from the rear. But the witness retreated from that statement in light of his clear opinion that the first gunshot was not disabling and the victim could have made bodily movements, including turning motions, in an interval between the superficial and the fatal shots. As to the discolorations around the forehead wound, the witness thought they were caused by the fall, although conceding that the bullet might have caused or contributed to it; and he took a similar view of the cause of a slight hemorrhaging within the victim's head on the left side,[1] probably a "contrecoup" phenomenon.

The storage area at the rear yielded a spent projectile imbedded in a syrup container, another nearby in a case of tonic cans, and lead fragments in two other places. A Commonwealth ballistics expert identified the projectiles as .38 special caliber bullets — the same caliber as the live rounds and spent cartridges found in the revolver removed from the car — and thought them consistent with having been fired from that revolver, but said positive attribution was not possible. The fragments were too small to warrant an opinion. On cross-examination the defense put questions to the witness about the velocity at the muzzle, and at eight to ten feet from the barrel, of bullets fired from the revolver, as well as about the capability for penetration of bullets so fired. (The witness thought the muzzle velocity was over 630 feet per second.) But the judge, over the defendant's exception, stopped this line of questions (the witness having indicated briefly that the questions implicated a number of variables).

2. *Evidence for the defense.* As already suggested by the concern whether the victim was facing the defendant when the first wound was suffered, the defendant claimed he was acting in self-defense and took the stand to give lengthy testimony on the point as follows. The victim was a fellow Albanian whom the defendant met in his native

---

[1] Described as slight subarachnoid hemorrhaging on the lateral surface of the left hemisphere over the temporal lobe.

village in 1941, when the defendant was ten years old and the victim about twenty-one. A friendship developed. In later years the men were separately involved in clandestine activities related to the Communist takeover or control of the country. Arriving in the United States in 1956, the defendant worked in restaurants, aspiring to own his own place. There was a renewal of friendship on the victim's visits after 1961 to this country from Canada, from which he emigrated in 1967. When the defendant opened a store near Waterbury, Connecticut, that year, he employed the victim. The venture collapsed. In the fall of 1972 the defendant was operating a store in Arlington, Massachusetts. The victim appeared and said he was in trouble with the law in Waterbury (the incident will be described below); also he feared he might in anger kill a certain fellow employee: would the defendant give him a job? The defendant did so. Sometime afterwards the defendant with another as partner opened the Central Square "sub" shop. The victim then took over the partner's interest, putting down a certain amount and undertaking to pay off the rest of the price.

There was some suggestion that the partners quarreled over excessive withdrawals by the victim from the business, but this was left murky in the record;[2] the defendant rather related the fatal episode to a difference about the theft of a gun. According to the defendant, he kept three handguns at the store: a .38 caliber special revolver below the cash register; the .357 revolver at the head of a short flight of stairs near the turn of the kitchen to the right; and the .380 pistol in a box in the rear storage area. On the Sunday preceding June 26 (a Tuesday), the defendant discovered that the .38 special was gone and, questioning the victim about this, judged from the victim's response that he had taken it. That night the defendant

---

[2] More than $1,000 in currency was found in the victim's pocket. Neither the defense nor the prosecution laid particular stress on this fact. See below, however, the victim's mention of "money from the pizza oven."

taxed the victim with the disappearance and got a gruff answer, confirming his suspicion.

On Monday night the defendant was ill at home. The victim called and said the defendant must open the store the following day, although it was the victim's turn to take the morning shift.[3]

Accordingly the defendant about 7:30 A.M. Tuesday arrived at the store, opened the front door with his key, locked it, and put the key in his pocket. As he was busying himself preparing for customers, he heard a click at the front door. The victim had entered. His appearance was frightening; he seemed to be out of control. The defendant said (in his translation of Albanian), "You told me you're going to come late." The victim answered, "[T]hat's why I'm here," and "I am sick and tired of you and your business, and I no going to give you the money from the pizza oven," and "Today is going to be the last day for you," "I going to kill you." At the same time the victim with frantic strength was slapping and shaking the defendant and shoving him against the counter and other furnishings of the shop, pushing him in the direction of the kitchen. "Now I going to get you. I go for the gun and I going to kill you." With this, the victim ran into the kitchen. The defendant followed, trying to "catch" him. Believing that the victim was fetching the pistol, the defendant reached for the revolver on the stairs. The victim came at the defendant with the pistol. "[D]rop the gun, please." Still the victim advanced. "I going to kill

---

[3] The defendant testified that one Hassan Manelli visited him that evening and was present at a previous telephone conversation between the defendant and the victim. In the midst of the trial, the defendant asked the aid of the court to bring Manelli in as a witness to testify to the violent character of the victim, the telephone call mentioned, and perhaps other things. It was made the subject of an exception and assigned as error that the witness was lost to the defense because the judge had not responded properly. The judge caused the sheriff to attempt to serve a summons under G. L. c. 277, § 66, on Manelli the next morning and bring him in. We need not inquire whether the judge might lawfully have done something more imperative since Manelli could not be found in any event. (It seems unlikely that his testimony would have been of major significance to the defense.)

Commonwealth *v.* Seit.

you." "Stop! No move!" As the victim slid a bullet into the chamber of the pistol, the defendant fired. He saw the victim "spin" or "turn." He did not remember how many times he fired, or how he made his way out of the place. He found himself driving aimlessly. At length, looking at the revolver, he surmised he had fired four times. He wanted to commit suicide but could not bring himself to the point. At the Lynn police station he believed he said that he thought he shot his partner, not that he had killed him.

A retired police officer qualifying as a practical ballistician was called by the defense. Attempting to pursue the line of inquiry that had been refused on cross-examination of the Commonwealth's ballistics expert, counsel sought to put questions about velocity and impact and penetration power, intending to elicit from the witness the opinion that the delivery of a bullet to the victim's forehead from the front could have spun him around so that he could receive the fatal bullet from the rear.[4] After argument at the bench and a short voir dire examination, the judge, over exception, cut short the defense attempt. If an opinion on the subject could be given, the judge thought it should be by a medical examiner (i.e., a pathologist with experience of gunshot wounds). A defense suggestion to put in only information about velocity and so forth, without any inferred opinion, was likewise refused; it would invite untrammeled speculation about "spinning." Also refused was proffered testimony through the same witness about his observations, derived largely from viewing target practice, of an involuntary firing reaction — that a person firing a weapon tends to keep on firing (even after ammunition is exhausted). The judge thought this unsatisfactory without psychological analysis beyond the wit-

---

[4] When counsel attempted to frame a hypothetical question at voir dire, it was in general terms of a wound to the forehead without mention of the uncontradicted fact that it was a superficial wound that did not engage the bone or brain. Cf. *Matsushita Elec. Corp. of America* v. *Sonus Corp.,* 362 Mass. 246, 264-265 (1972).

ness's capacity; in all events it was far removed from the present facts.

As tending to support a probability that the victim was the aggressor, evidence was received of his reputation as mean and violent (the defendant had testified about his early recollections of the victim acting as a strong man and carrying firearms). The judge allowed proof of the incident in Waterbury. The victim was arrested there in April, 1972, for threatening with a loaded gun two youths who had asked him for a dime to make a telephone call. He had no permit for the gun and when arrested gave a false name and address. Evidently he pleaded guilty to a reduced charge of "reckless endangerment" and was fined and placed on probation. Also received was testimony of a store owner in Central Square that the victim carried a gun about two months before the homicide and that on the Sunday night he appeared mean and nervous and said, "I get him" (making a hand gesture as with a gun) and, "You'll hear about it." (The witness had not recounted this episode to the police when they spoke to him after the homicide.) [5]

3. *Rebuttal evidence.* In rebuttal, the prosecution introduced some reputation testimony suggesting that the victim was not as painted by the defense. In addition, to meet the defendant's testimony that the victim "spun"

---

[5] In respect to the testimony that the victim said, "I get him," and so forth, the defendant excepted and assigned error to the judge's refusal of an instruction that a threat is a communication of purpose and is evidence that an occurrence which might have been in execution of the threat was in fact so, regardless of whether the threat was communicated to the object. *Commonwealth* v. *Rubin,* 318 Mass. 587 (1945), was cited, but there the threat was clear and plainly directed to the defendant. See *Commonwealth* v. *Edmonds,* 365 Mass. 496, 499-504 (1974). Here the threat was equivocal at most and not specifically directed. The defendant had the benefit of a clear charge about the temper and character of a man as bearing on the danger to be apprehended from him.

An assignment complains that the judge failed to charge to the effect that the burden was on the Commonwealth to negate self-defense, and that a defendant's testimony, standing alone, could be enough to warrant a finding that he acted under apprehension of bodily harm. We think the charge as given was adequate on both these points.

about (as distinguished from "turned"), and presumably also to meet any thought of "spinning" that might have been generated in jurors' minds by references to velocity and related matters, the prosecution recalled the patholo-gist.[6] He testified that, considering the surface character of the wound at the forehead, there was no likelihood that the gunshot could have spun the victim around, regardless of the precise velocity of the bullet, its caliber, or other features. The witness, however, reiterated his earlier opin-ion that as the wound was not disabling, the victim could still have made a voluntary turning motion. There was due objection by the defendant to the admission of the expert's negative opinion about spinning.

4. *Claimed errors.* We shall refer further to parts of the record where relevant to the discussion below, and comment now on the two categories of claimed error that are most strongly pressed.[7]

(a) As indicated, the defendant attacks the judge's ex-clusion of opinions by the defense ballistician and admis-sion of the opinion of the Commonwealth's pathologist. The defendant says, in essence, that if a ballistician was not allowed to testify to a spinning effect because he was not a pathologist, then a pathologist should not have been permitted to testify to the contrary because he was not a ballistician. The purported symmetry, however, is subject to challenge. Compare and distinguish *Muzi* v. *Common-wealth,* 335 Mass. 101, 106 (1956).[8] We think the judge could hold with reason that the possibility of a spinning effect was conditioned by the extent or depth of the wound

_____

[6] This witness was a physician who had served as forensic pathologist for twenty years and performed more than 5,000 autopsies and testified several hundred times in courts of this and other States.

[7] Assignments of less weight are dealt with at notes 3 and 5 *supra,* and note 10 *infra.*

[8] In the cited case, the qualifications of plaintiff's and defendant's experts were roughly similar, hence if one were allowed to testify on the matter, all must be. The present situation is different, as indicated in the text below.

at the forehead. Thus the defendant's witness, having no command of physiology or pathology, was not qualified to give an opinion on the crucial question, although he understood ballistics. Cf. *Guinan* v. *Boston Elevated Ry.*, 267 Mass. 526 (1929).[9] On the other hand, the Commonwealth's pathologist had undoubted expertness regarding wounds, and enough knowledge through experience of the workings of guns and projectiles to avoid error on that phase (his actual testimony on the latter subject is reassuring of the adequacy of his understanding). See *Commonwealth* v. *Medina*, 372 Mass. 772, 780-782 (1977); *Commonwealth* v. *Boyd*, 367 Mass. 169, 181-182 (1975). Hence he was qualified to give a useful opinion. It should be recalled that the qualification of a witness to offer an expert opinion on a given question is for determination by the trial judge as a preliminary issue of fact. See *Sacks* v. *McKane*, 281 Mass. 11, 21 (1932); *Commonwealth* v. *Spencer*, 212 Mass. 438, 447-448 (1912); W.B. Leach & P.J. Liacos, Massachusetts Evidence 99-100 (4th ed. 1967). Whether we say that he has a wide discretion in deciding the question, or that his ruling will be reversed only for error in point of law (see *Commonwealth* v. *Boyd, supra; Commonwealth* v. *Devlin*, 365 Mass. 149, 152 [1974]; *Commonwealth* v. *Capalbo*, 308 Mass. 376, 380-381 [1941]), the result is that such decisions at trial level are rarely upset on appellate review. See *Campbell* v. *Thornton*, 368 Mass. 528, 541 (1975); *Muzi* v. *Commonwealth, supra; Commonwealth* v. *Ellis*, 319 Mass. 627, 631 (1946).

Our conclusion may be expressed in another way. As long as a proper hypothetical question to the ballistician would have to assume as slight a wound as was testified to originally by the pathologist, no positive opinion by the ballistician about a spinning effect could be rationally maintained (see n.4). But the defense never seriously challenged that original testimony.

---

[9] Similarly, one of the reasons given by the judge for excluding the ballistician's testimony about an involuntary firing reaction was his lack of expertness in the science of psychology.

(b) The defendant argues that he was entitled on the proofs to a directed verdict of acquittal of the murder charge, as demanded at the close of all the evidence (or to the allowance of his post-verdict motion for a new trial so far as based on the same ground). We think, to the contrary, that enough was shown to warrant a jury finding of "malice" and other requisites to murder in the second degree. See *Commonwealth* v. *Greene,* 372 Mass. 517, 518-520 (1977); *Commonwealth* v. *Festa,* 369 Mass. 419, 423-424 (1976). There was no dispute that the defendant, with intent to do the victim injury, fired the shot that killed him, and it could be found that he fired four shots with the same purpose. So also a jury could conclude that the two gunshots that found their object were delivered when the defendant was retreating from the victim rather than confronting him with a pistol. Self-defense was put in question from the beginning by the evidence that the store proper was undisturbed when the Cambridge police arrived, despite the defendant's testimony about the physical encounter there; that defense was also weakened by the circumstance that the defendant had not mentioned an attack on him by the victim when he spoke to the police in Lynn.[10] The defendant's memory or consciousness might be thought selective: he claimed to remember the victim's spinning or turning but nothing beyond that about the shooting. Though only "thinking" he "shot" the victim when he reported to the police, he had made no effort to summon aid for the victim. A dispute about a stolen gun (or a business quarrel) might have furnished a possible reason for fury on the part of the victim, but instead it could have goaded the defendant to murder.

5. *Section 33E considerations.* Although the court is

---

[10] Eliciting from the defendant on cross-examination that his testimony differed from his account freely given to the police after Miranda warnings was not, as the defense contends, an improper use of the defendant's "silence" at the time of arrest (cf. *Doyle* v. *Ohio,* 426 U.S. 610 [1976]); it was a legitimate means of impeaching the defendant by showing inconsistency. Of course the defendant could explain any elision or inaccuracy in his statements to the police as being due to his disturbed state of mind or other causes.

unanimous in finding no reversible error on the present record, a majority are persuaded after reviewing the whole situation that a verdict of manslaughter would be "more consonant with justice" (*Commonwealth* v. *Baker,* 346 Mass. 107, 109 [1963]) than the verdict of murder, and our duty under G. L. c. 278, § 33E, will be exercised accordingly. The defendant applied to the trial judge for such mitigation, but the judge stated correctly that the power was not his, it was lodged in this court by § 33E. See *Commonwealth* v. *Jones,* 366 Mass. 805, 809-810 (1975).

Here is a case of friendship between the parties over a period of more than thirty years, with the defendant assisting the victim materially on two or more occasions. There is no indication of animosity between them until the episode in suit. See *Commonwealth* v. *Jones, supra* at 808. No third-party witness exists to any part of the actual event, and the defendant's account, which he took the stand to defend, deserves consideration. See *Commonwealth* v. *Mahnke,* 368 Mass. 662, 700-704 (1975), cert. denied, 425 U.S. 959 (1976). There was evidence that the victim was a man of violent temper who might have started a struggle and used a gun. Although we may discount the chance that the victim, if he came at the defendant, was spun about by the bullet to his forehead, the possibility remains that having been hit frontally by that bullet and smarting from it, the victim turned, and then received immediately the deadly shot. (The defense suggests that the jury may have slighted this "turning" possibility because it overvalued the impressive rebuttal testimony of the pathologist which, however, merely contradicted "spinning." We add that the prosecutor's closing argument could be understood to intimate, erroneously, that the pathologist had foreclosed "turning" as well.[11]) But con-

---

[11] The prosecutor referred to the pathologist's original opinion based in part on the fact that the spent projectiles and fragments were found in the rear storage area. But the pathologist had receded from that opinion, as we indicated earlier in the text.

sidering that the defendant probably fired four shots, he could in all events be held plausibly to have used excessive force. And on all the facts, there is room for the belief, alternatively, that the defendant acted from a "transport of passion" upon provocation, or upon "sudden combat." In deciding whether to shade the verdict to the lesser offense,[12] we are entitled to give weight to the fact that the defendant was a hard worker with no prior criminal record. See *Commonwealth* v. *Vanderpool,* 367 Mass. 743, 750 (1975). As the trial judge said, this was not a hoodlum or gangster.

Recognizing and affirming that the mitigating power under § 33E is to be exercised sparingly, a majority think it is availed of properly here.

The case is remanded to the Superior Court where the verdict and sentence are to be vacated; a verdict of guilty of manslaughter is to be entered and sentence imposed thereon.

*So ordered.*

---

[12] It is true that manslaughter was left to the jury as well as murder, but the fact that a jury passed over the lesser offense has not stood in the way of mitigation under § 33E when otherwise justified. See *Commonwealth* v. *Jones,* 366 Mass. 805, 808 n.1 (1975); *Commonwealth* v. *Williams,* 364 Mass. 145, 151 (1973); *Commonwealth* v. *Baker,* 346 Mass. 107, 119 (1963). Cf. *Commonwealth* v. *MacDonald,* 371 Mass. 243, 248-249 (1976); *Commonwealth* v. *Ravida,* 371 Mass. 600, 604 (1976).