COMMONWEALTH vs. JOHN MICHAEL ALMON.

Essex. September 13, 1982. — November 10, 1982.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, NOLAN, & LYNCH, JJ.

*Homicide. Practice, Criminal,* Capital case.

This court declined to exercise its extraordinary power under G. L.
c. 278, § 33E, either to set aside a verdict of murder in the first degree
and direct the entry of a finding of a lesser degree of guilt, or to grant a
new trial, where the record contained ample evidence of deliberate
and premeditated aggression by the defendant, who was armed with a
deadly weapon. [604-608]

INDICTMENT found and returned in the Superior Court
Department on May 30, 1980.

The case was tried before *Irwin,* J.

*Daniel E. Callahan* for the defendant.

*Dyanne Klein Polatin,* Assistant District Attorney, for the
Commonwealth.

HENNESSEY, C.J. The defendant John Michael Almon
was convicted of murder in the first degree by an Essex
County jury and sentenced to the mandatory term of life
imprisonment. On this appeal, the defendant does not sug-
gest that legal error was committed during the trial. The
sole submission is that, because a consideration of the whole
case reveals that some leniency is deserved, this court should
exercise its power under G. L. c. 278, § 33E, to set aside the
verdict of murder in the first degree and direct the entry of a
finding of a lesser degree of guilt, or to grant a new trial.
After careful consideration of the whole case, we disagree
with the defendant and decline to alter the verdict.

On March 18, 1980, in Salem, at approximately 6 P.M.,
Paul Legere was stabbed twice in a confrontation with

Almon. The victim died a week later as a result of the stabbings. The Commonwealth introduced as a witness John Waller, who was unable to read, write, or tell time,[1] who testified that he observed almost the entire altercation between the defendant and the victim. Waller testified that he was with the defendant at the Multi-Save Market in Salem in the early evening of March 18, 1980. While the defendant and the victim were discussing pills, the defendant told Waller to "[g]et the guy off me, he is bugging me." As the three men walked together outside the store, the victim asked the defendant to give back pills which the defendant had. The two men became angry and continued to argue about the pills. Waller then saw the defendant and the victim go into an alley leading to the back of a house. Thinking the two men were going to fight, Waller went down an alley on the other side of the house. Waller saw the defendant, still angry about the pills, hit the victim. The defendant immediately thereafter turned to Waller, said he "couldn't take no more" and stabbed the victim in the throat. The victim retreated to a corner and came out again, whereupon the defendant stabbed him in the midsection of the abdomen. Waller heard the victim say to the defendant, "John, may God forgive you for what you did to me." Waller testified that the victim was a strong fellow, at least his own size — six feet, four inches, one hundred ninety pounds. At no point did Waller see any weapon in the victim's hand or see the victim strike the defendant.

After leaving the alleyway with the defendant, Waller crossed the street and told other people what had happened, while the defendant entered a house next to the alley. Waller did not contact the police for a few days because he was afraid that he would be charged with murder. When he reported the incident, however, Waller was warned that charges would be lodged against him if he did not tell the truth.

---

[1] He was described to the jury by the prosecutor as emotionally and intellectually slow.

Kenneth Arons, a young boy, testified that he was on the front porch of his house in the early evening of March 18. Arons observed the defendant, John Waller, and two other men walking toward his house from the Multi-Save store. While the four men were discussing money in front of Arons' house, Arons saw the defendant take his buck knife out of its sheath and put it in his pocket. Arons also heard the defendant suggest that the men go into the alleyway next to Arons' home. Two of the men and the defendant proceeded down one alleyway and Waller went down the alleyway on the other side of the house. Arons then went into his house, came outside again shortly thereafter, and saw a man lying in the alley by his back door, bleeding. Arons saw Waller walk out of one alley and the defendant run out of the other alley to a house next door.

Thomas Monaco, a sixteen year old boy, was riding his bicycle in the early evening of March 18, 1980, and he saw two men, about 100-120 feet away, having an argument. Monaco saw a man (the defendant) with a beard and wearing a hat, strike the victim, who fell to the ground. It was dusk and Monaco could not see whether the defendant had anything in his hand. During the fight, for a period of "[b]arely less than a minute," both men were blocked from Monaco's view by a chain link fence. When the victim stood up, Monaco saw that he was bleeding from the neck.

On the evening of the incident, Candice Christensen was visiting at the apartment of her cousin, Susan Oberman, when the defendant arrived about 6 P.M., carrying a grocery bag under one arm and a bloody buck knife in one hand. In response to Christensen's observation of blood on the knife, the defendant stated that he had "stabbed somebody." The defendant then went to the sink, picked up the soap, and said, "This is how you wash the blood off a knife so that it doesn't rust." Christensen then went into the bedroom and remained there until after the defendant's arrest. While she was in the bedroom the defendant came in, changed his T-shirt and left after placing the soiled shirt under the mattress.

Susan Oberman saw the defendant in her apartment on the day of the stabbing. He appeared nervous, upset, and afraid. He informed her that he had had an argument with someone and had stabbed him in the neck with his knife. The defendant demonstrated, with his knife, how he had slashed the victim's neck. The defendant then changed his soiled shirt. When the police arrived, he was eating a sandwich in the kitchen.

Kenneth Costello, a Salem police officer, arrived at the scene of the stabbing as the victim was being ministered to by ambulance attendants. Costello's investigation led him to an adjoining apartment house where he discovered the defendant. At the police station, Costello interviewed the defendant, who claimed that the blood on his pants and work boots resulted from fighting with a friend, Joey Clark.

The twenty-one year old defendant was the sole witness introduced by the defense. He testified that during the morning on the day of the stabbing he spent four hours taking an electronic technician's test. He arrived at a corner bar in Salem at approximately 2:30 P.M. Shortly thereafter he saw a friend, Joey Clark, and they went to Susan Oberman's apartment about 4:15 P.M. The defendant later left the apartment and went to the Multi-Save store to buy cigarettes and beer. In the store, the defendant saw the victim but they did not speak to each other. Outside the store, the defendant encountered John Waller. As the defendant and Waller were walking away, the victim approached the defendant and asked him whether he wished to buy any drugs. The defendant responded, "Maybe," and the victim walked to a car, obtained a small plastic bag from the glove compartment, removed a small black capsule from the bag and told the defendant that it was a "black beauty." Despite the victim's assurances of a "good deal," the defendant declined and walked away with Waller. The victim continued to call and run after them, repeatedly stating that he needed money. The defendant continued to reject the deal and stated that the drugs were not really what the victim said they were.

The victim — whom the defendant described as taller, broader, and ten to fifteen pounds heavier than he — and the defendant went down an alleyway to the back of the apartment building. At the rear of the building, the victim said that he had not wanted to argue about the pills in front of the building and that the defendant should not go back on his word after stating at the Multi-Save that he was going to buy the pills. When the defendant stated that he had said only that he would look at the pills, that he never said that he would buy them, and that the victim had lied to him, the victim leaped at the defendant, hitting him and knocking him to the ground. When the defendant hit the ground he felt pain in his back so severe that he could not move;[2] he blacked out. The defendant next remembered getting up from the ground with a bloody knife in his hand and seeing the victim lying on the ground. The defendant then grabbed the grocery bag and headed to the Oberman apartment next door.

Upon arriving at the Oberman apartment, the defendant told Oberman, Christensen, and Clark that he had been in a fight and was not sure what had happened. After he began to pace nervously, Oberman suggested that he wash his hands and change his clothes before the police arrived. The defendant described himself as scared and shaking during this period. When the police arrived, he was in the kitchen, eating.

On cross-examination the defendant denied telling Oberman and Christensen that he had "stuck someone in the neck." He did not recall washing the knife or hiding it. Although he drank some beer on the day of the stabbing, the defendant testified that he was not drunk. The defendant denied taking his knife out of its sheath before going into the alley. The defendant was impeached by a prior conviction

[2] The defendant testified that his back problems began in 1977 when he suffered torn back muscles and a bruised tailbone. He reinjured himself earlier in March, 1980, and had gone to Lynn Municipal Hospital. The hospital did not give the defendant medication but did give him a back brace and a cane.

for being an accessory after an escape. The judge, however, denied the Commonwealth's request to impeach the defendant with a prior firearms conviction and the Commonwealth waived its request to use a prior conviction for possession of a hypodermic needle.

The judge instructed the jury on both degrees of murder and manslaughter. In the course of his charge, he defined malice, deliberate premeditation, reasonable provocation, self-defense, and the allocation of the burden of proof. Counsel registered no objections to the instructions and raises none here.

Under G. L. c. 278, § 33E, we must consider whether the verdict of murder in the first degree was against the weight of the evidence considered in a large or nontechnical sense. *Commonwealth* v. *Bowman*, 373 Mass. 760, 765 (1977). *Commonwealth* v. *McInerney*, 373 Mass. 136, 140 (1977). *Commonwealth* v. *Jones*, 366 Mass. 805, 808 (1975). *Commonwealth* v. *Baker*, 346 Mass. 107, 109 (1963). Although the power is to be used with restraint, *Commonwealth* v. *Williams*, 364 Mass. 145, 151 (1973), § 33E requires that relief be granted where there has been a miscarriage of justice. *Commonwealth* v. *White*, 353 Mass. 409, 424 (1967), cert. denied, 391 U.S. 968 (1968). Nonetheless, "[w]e do not sit as a second jury to pass anew on the question of the defendant's guilt." *Commonwealth* v. *Reddick*, 372 Mass. 460, 464 (1977).

After a thorough reexamination of the evidence, we conclude that the verdict rendered was well founded. To sustain its theory of deliberate premeditation the Commonwealth had to show that the defendant's resolution to kill was the product of cool reflection. *Commonwealth* v. *Blaikie*, 375 Mass. 601, 605 (1978). The Commonwealth provided ample evidence of this element. Kenneth Arons, from his front porch, saw the defendant and the victim arguing about money. Arons heard the defendant say that he and the victim should go into the alley. Arons then saw the defendant take a knife out of its sheath.

John Waller and Thomas Monaco witnessed the defendant and the victim arguing in the backyard. Waller saw the defendant, who was angry about some pills, strike the victim. The defendant then turned to Waller, said he could not take any more, and stabbed the victim in the throat. Waller watched the defendant stab the victim a second time. Monaco also saw the defendant strike the victim and observed the victim bleeding from the neck. No witness, including the defendant, saw a weapon in the possession of the victim.

These circumstances[3] clearly indicate deliberate premeditation. The defendant carried the weapon on him during the argument with the victim; he asked the victim to go down the alleyway; and he removed the knife from its sheath before entering the alleyway. Therefore, this case does not resemble those cases where the weapon "was present fortuitously, an instrument not of design but of opportunity." *Commonwealth* v. *King,* 374 Mass. 501, 507 (1978). See *Commonwealth* v. *Williams,* 364 Mass. 145, 152 (1973).

In addition, the evidence does not indicate that the defendant formed his intention to stab the victim "in the heat of sudden affray or combat." *Commonwealth* v. *Baker,*

---

[3] The Commonwealth presents extensive testimony regarding the defendant's behavior after the stabbing. The defendant urges that this evidence "is rarely relevant to the issue of premeditation." *Commonwealth* v. *Blaikie,* 375 Mass. 601, 605 (1978). The Commonwealth observes, however, that in the more recent case of *Commonwealth* v. *Wilborne,* 382 Mass. 241, 245 (1981), we specifically considered such posthomicide conduct as having a direct bearing on the defendant's "conscious and fixed purpose to kill." *Id.,* quoting *Commonwealth* v. *Bonomi,* 335 Mass. 327, 356 (1957). We point out that the posthomicide behavior involved in *Wilborne* differed greatly from the facts involved here or in *Blaikie.* Compare *Wilborne, supra* at 245 (after stabbing husband in the throat, defendant would not allow wife to call an ambulance, although victim lay wounded and gasping for breath for at least fifteen to twenty minutes after he was stabbed), with *Blaikie, supra* at 605 (defendant elaborately concealed victim's body, made misleading and false statements to police officers, and fled to another State after murder). We do not need to address, however, whether the defendant's posthomicide conduct should be considered as evidence of premeditation or merely as evidence of consciousness of guilt. In this case, we conclude that there is ample evidence to uphold the jury's verdict even without considering the defendant's posthomicide conduct.

346 Mass. 107, 119 (1963). Although the defendant and the victim were having an oral disagreement before the defendant stabbed the victim in the alleyway, "[t]he pitch and tempo of the dispute were by no means frenzied." *Commonwealth* v. *Whipple*, 377 Mass. 709, 715 (1979). Furthermore, both Waller and Monaco testified that they saw the defendant strike the victim first — they did not ever see the victim strike the defendant nor see any weapon in the possession of the victim. Cf. *Commonwealth* v. *King*, 374 Mass. 501, 506 (1978) ("Although the defendant apparently first set upon [the victim], what followed was not a one-sided beating"); *Commonwealth* v. *Jones*, 366 Mass. 805, 808-809 (1975) ("[T]he defendant at all times was reasonably apprehensive that the victim might use the razor which the defendant knew the victim possessed"). The case before us did not involve a "senseless brawl" between two individuals. See *Commonwealth* v. *Ransom*, 358 Mass. 580, 583 (1971). It was a one-sided altercation. Thus, even though the victim was larger and older than the defendant, all violence was initiated and carried out solely by the defendant. Furthermore, the nature and location of the first wound along with the second stabbing also evinced a conscious and fixed purpose to kill. See *Commonwealth* v. *Wilborne*, 382 Mass. 241, 245 (1981). In short, the stabbing by the defendant in this case resembles a cool execution rather than a frenzied, spontaneous killing.

The defendant argues that his testimony, which demonstrated that the victim was the aggressor and that the defendant blacked out during the stabbing, deserves consideration. *Commonwealth* v. *Seit*, 373 Mass. 83, 94 (1977). The defendant contends that because he was the only person who witnessed the entire event and because crucial Commonwealth testimony came from Waller, a witness of limited competence, the defendant's version of the events on March 18, 1980, must be given credence. As we stated in *Commonwealth* v. *Reddick*, 372 Mass. 460, 464 (1977), "The jury were not required to believe, and plainly did not believe, the defendant's testimony so far as it tended to show

lack of malice, reasonable provocation, self-defense, sudden transport of passion and heat of blood." Cf. *Commonwealth* v. *Bowman,* 373 Mass. 760, 765 (1977) ("[We] point to the grave difficulties a jury might feel in crediting the defendant's responses to the case made against him of murder with malice aforethought"). Furthermore, the *Seit* case, relied upon by the defendant, is distinguishable from this case because in *Seit* there was no third-party witness to "*any part* of the actual event" (emphasis supplied). *Commonwealth* v. *Seit,* 373 Mass. 83, 94 (1977). Thus, in *Seit,* we determined that the defendant's testimony deserved consideration. *Id.* Here, however, there were other witnesses to the stabbing. Waller saw everything that occurred except for whatever transpired while the victim and the defendant proceeded down the alleyway to the backyard. Monaco also witnessed a substantial portion of the incident. Furthermore, in *Seit,* there was evidence showing that the victim was a man of violent temper, thus presenting another reason to give some consideration to the defendant's testimony. *Seit, supra* at 94. In contrast, in this case no evidence was presented indicating that the victim was prone to violence. Thus, we will not disturb the jury's refusal to believe the defendant's description of the events leading up to the stabbing.

Finally, after a review of other § 33E cases we see no other factors leading us to interfere with the jury's verdict. There was not considerable drinking prior to the murder. See *Commonwealth* v. *Jones,* 366 Mass. 805, 808 (1975). See also *Commonwealth* v. *King,* 374 Mass. 501, 507-508 (1978). The defendant testified that he was not drunk. There was no history of a "generally good relationship between the defendant and the victim." *Commonwealth* v. *Dalton,* 385 Mass. 190, 196 (1982) (defendant and victim were married for thirty-three years). See also *Commonwealth* v. *Seit,* 373 Mass. 83, 94 (1977) (defendant and victim were friends for a period of more than thirty years). Finally, we are permitted to weigh personal factors in addition to the factual and legal considerations. See *Common-*

*wealth* v. *Tavares,* 385 Mass. 140, 159 (1982). In this case, although the defendant was only twenty-one years old and does not have a criminal record that indicates a tendency to violence, these factors are insufficient to warrant ignoring the Commonwealth's ample evidence or disturbing the jury's verdict.

*Judgment affirmed.*