STATE OF NEBRASKA, APPELLEE, V. ISAIAH JERRY JONES, APPELLANT.
328 N.W.2d 166

Filed December 10, 1982.   No. 44117.

(1)

John E. North, Jr., and Alan G. Stoler of Fromkin, Herzog, Jabenis & North, for appellant.

Paul L. Douglas, Attorney General, and J. Kirk Brown, for appellee.

KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, WHITE, HASTINGS, and CAPORALE, JJ.

McCOWN, J.

The defendant was charged with first degree murder in the deaths of Ann L. Speese and her 12-year-old daughter, Tina M. Speese. A jury found the defendant guilty of murder in the first degree in the death of Tina Speese, and guilty of second degree murder in the death of Ann Speese. Judgments were entered upon the verdicts, and the trial court sentenced the defendant to life imprisonment for the second degree murder of Ann Speese and to death for the first degree murder of Tina Speese.

On December 4, 1979, the Omaha Police Depart-

ment was called to a residence at 3456 Grant Street. When the police officers arrived they were met by 16-year-old Robert Frazier, who lived at the address with his mother.

Frazier showed the officers a car partially in and partially out of the Frazier garage. The trunk of the car was open and Frazier had already removed some women's clothing, newspapers, and blankets, all of which were blood soaked. The officers observed what appeared to be bloodstains in the trunk well of the car.

Frazier informed the police that Isaiah Jerry Jones had parked the car in the garage earlier that morning and had instructed Frazier to clean out the trunk of the car. Jones was a friend of Frazier's mother and had frequently been at the Frazier residence. Frazier showed the police a handgun given to him by Jones, who had told him that he had been shot in a gun battle as the explanation for the blood in the trunk.

Frazier, who had the keys to the car, also told officers that he had looked in the glove compartment of the car, where he had found a checkbook and a savings and loan book bearing the name of Ann Speese. A police officer testified that he found the checkbook of Ann Speese on the floor of the car. The police officers seized the items which had been removed from the car, and impounded it. The police attempted to locate Jones but were unable to find him in Omaha.

The police also tried to contact Ann Speese, but their investigation indicated that no one had seen her or her daughter since December 2, 1979. At that point an investigation was begun into the disappearance of Ann Speese and her daughter, and the police obtained a search warrant to search Jones' apartment in Omaha.

As part of the search, a forensic serologist conducted a luminol examination of the apartment. A luminol examination involves the application of a

chemical which emits a light blue glow in the presence of bloodstains, which light can be seen in photographs. The luminol examination showed bloodstains on the floor and walls throughout Jones' apartment. Later tests showed the blood which produced the stains was human, matched the blood type of the victims, and did not match the blood type of Jones. Bloodstains matching the victims' blood type were also found on various items of Jones' clothing and other personal items discovered and seized in his apartment.

Further investigation established that on December 3, 1979, Jones had rented carpet cleaning equipment and inquired as to whether it would remove blood from carpeting. On the same day, Jones was observed by several witnesses obtaining a post-hole digger and a shovel from friends. The investigation also established that Jones had been acquainted with Ann and Tina Speese for approximately 2½ years prior to December 1979. Several witnesses, including Jones' sister, testified that they had seen Jones with the Speeses on December 2, 1979, the last day they were seen alive.

On January 14, 1980, the bodies of Ann and Tina Speese were discovered in shallow graves in a wooded area along Interstate 29 near Oregon, Missouri. Exposed leg bones led to the discovery. Both bodies were partially clothed, and the body of Ann Speese was dismembered. The bodies were identified by dental charts and by a key on a chain around the neck of the girl's body, which fit the bicycle of Tina Speese.

A pathologist testified that the death of Ann Speese was probably caused by multiple wounds to the head inflicted by a blunt instrument. The pathologist also testified that Tina Speese died as a result of asphyxiation.

There was also testimony at trial that on December 6, 1979, Jones had requested friends of his to drive him to Kansas City along Interstate 29, and

that when they approached the site where the Speese bodies were later found, Jones scanned the area with binoculars and requested the driver to go past the site a second time.

On March 25, 1980, Jones was arrested in Chicago, Illinois, and returned to Omaha, where he was charged and tried. The witnesses for the defense testified to an alibi defense. The defendant did not testify at trial. The jury found Jones guilty of second degree murder in the death of Ann Speese and first degree murder in the death of Tina Speese. The trial court sentenced him to life imprisonment for the second degree murder and to death for the first degree murder. This appeal followed.

The defendant contends that there was prejudicial error in admitting or refusing to suppress various items of evidence, and in refusing to permit defendant's trial counsel to withdraw and requiring him to proceed rather than to appoint new counsel. Defendant also contends that the Nebraska death penalty statutes are unconstitutional, and that the trial court erred in imposing a sentence of death upon the defendant.

The defendant asserts that the trial court erred in refusing to suppress evidence which had been seized and removed from the defendant's car. Defendant argues that the evidence was derived from a warrantless search of the car by police officers. The evidence does not support the defendant's contention.

When the police arrived at the Frazier residence the articles from the trunk of the defendant's car had already been removed from the trunk by the defendant or Frazier, and Frazier, who had the keys to the car and control of it, showed the articles to the police and explained how they had come to be there. The officers had a legal right to be where they were, and the objects, as well as the interior of the trunk and the car, were in plain view.

The existence of probable cause must be deter-

mined by a practical and not by a technical standard. When objects in an automobile which are indicative of a criminal offense are within the plain sight of an officer who has the right to be in the position to have such view, a search is justified and legal. *State v. Connor,* 189 Neb. 269, 202 N.W.2d 172 (1972); *State v. Collins,* 186 Neb. 50, 180 N.W.2d 687 (1970). At the suppression hearing prior to trial the court properly refused to suppress this evidence, and that determination was correct.

Defendant also contends that it was error to admit testimony concerning the luminol examination of the defendant's apartment, and to admit the photographs which showed the luminol reaction. The argument is that there was not sufficient foundation to qualify the State Patrol forensic serologist or the officer who took the photographs as experts in regard to luminol testing.

The officer who took the photographs essentially testified as a photographer. His job was merely to photograph what he saw, and his testimony established what he had done, and the photographs accurately reflected what he had seen. Such testimony is clearly admissible and did not require foundation evidence showing that he had prior experience with the luminol process.

The forensic serologist testified that luminol examinations are considered and recognized as reliable by the forensic serology profession, and that she had personally conducted luminol experiments and tests and had done fieldwork. The fact that she was a qualified professional serologist is not disputed by the defendant. The argument is that she was not sufficiently experienced in luminol testing to be an expert witness. There is no evidence that luminol testing is not in the field of expertise of a professional serologist.

The admission of expert testimony is ordinarily within the trial court's discretion, and its ruling will be upheld in the absence of an abuse of discretion.

*Shover v. General Motors Corp.,* 198 Neb. 470, 253 N.W.2d 299 (1977). There was no abuse of discretion in the present case.

The defendant also contends that it was prejudicial error to admit into evidence 24 colored photographs and duplicate slides showing the condition of the bodies of the victims at the time they were brought into the autopsy room, but before the autopsies were begun. The defendant argues that the photographs and slides were gruesome and excessive in number and the prejudicial effect of such photographs upon the jury far outweighed the probative value of the photographs.

The pathologist testified that the photographs helped to illustrate his testimony, and that the slides were preferable to prints so that each photograph would not have to be shown to each juror individually. The pathologist testified, using the slides, that all the photographs showed the condition of the bodies of the victims; that the body of Tina Speese showed bruises indicating that she died as a result of asphyxiation or suffocation; and that the dismembered body of Ann Speese showed bruising around the head and blows to the head with a blunt instrument which probably caused the death, and that the injuries were inflicted while the victim was alive. He also testified that the photographs showed that a saw, or similar mechanical means, was used to dismember the body of Ann Speese.

All the photographs and slides show the condition of the bodies or parts of the bodies of the victims prior to autopsy incisions or any post mortem work. A majority of the photographs show the nature and extent of wounds or injuries and reflect or explain testimony as to the probable causes of death. Six or seven of the photographs and slides were substantially duplicative of other photographs or slides already introduced.

The argument is that the photographs were also unnecessarily prejudicial because the defendant of-

fered to stipulate to the findings of the pathologist contained in the autopsy report. In essence the defendant argues that if the defense stipulates that an autopsy report may be admitted into evidence, without admitting the defendant's responsibility for the acts reflected in the report, the stipulation prevents the State from introducing photographs supportive of the pathologist's testimony. We disagree.

The admission into evidence of gruesome photographs rests in the sound discretion of the trial court, which must determine their relevancy and weigh their probative value against their possible prejudicial effect. *State v. Freeman,* 201 Neb. 382, 267 N.W.2d 544 (1978). In a homicide case, photographs of the victim, upon proper foundation, may be received in evidence for purposes of identification, to show the condition of the body, the nature and extent of the wounds and injuries, and to establish malice or intent. *State v. Williams,* 205 Neb. 56, 287 N.W.2d 18 (1979).

A majority of the photographs and slides in the present case were admitted into evidence to prove identity, condition of the victims' bodies, the cause of death, and intent and malice. We cannot say that the trial court abused its discretion to the extent that a new trial is required where, as here, more photographs were admitted than were necessary to establish the State's case. A photograph which illustrates or makes clear some controverted issue in a homicide case may be received even if it is gruesome, where a proper foundation has been laid. *State v. Partee,* 199 Neb. 305, 258 N.W.2d 634 (1977).

Under the circumstances shown in the record in the present case, we cannot say, as a matter of law, that the probative value of the photographs was outweighed by their possible prejudicial effect on the defendant or that there was an abuse of discretion on the part of the trial court which requires a new trial.

This court again cautions that the probative value

of gruesome photographs must be carefully weighed by the trial courts, which must determine the relevancy of the photographs and weigh their probative value against their possible prejudicial effect. When other evidence is available prosecuting attorneys should avoid the use of gruesome photographs when the relevance or probative value of such photographs is unclear or doubtful. In cases where it is appropriate to admit some gruesome photographs into evidence, no more photographs than absolutely necessary should be used.

Defendant also contends that the trial court erred in refusing to permit defendant's trial counsel to withdraw, and in refusing to appoint new trial counsel. It should be noted here that defendant's counsel at the time of trial was the second counsel appointed for the defendant, and that defendant's and his counsel's action to replace trial counsel came only 4 days prior to the date trial was scheduled to commence. Counsel on appeal is now the third appointed counsel. The record reflects a breakdown of communication between defendant and his counsel and raises a strong inference that defendant's requests for new counsel were based on mistrust of all lawyers and an attempt to delay the proceedings.

The law in this state is well settled that the right of an indigent defendant to have counsel does not give him the right to be represented by counsel of his own choosing, and mere distrust of, or dissatisfaction with, appointed counsel is not enough to secure the appointment of substitute counsel. *State v. Fallis,* 205 Neb. 465, 288 N.W.2d 281 (1980). The standard for determining whether or not counsel for defendant in a criminal prosecution has provided adequate representation requires that trial counsel perform at least as well as a lawyer with ordinary training and skill in the criminal law in his area, and that he conscientiously protect the interests of his client. *State v. Shepard,* 208 Neb. 188, 302 N.W.2d 703 (1981). There is no evidence in the present case that trial

counsel failed to adequately represent the defendant. To the contrary, the record reflects a competent and capable defense.

Finally, the defendant contends that the trial court erred in imposing a sentence of death upon the defendant. More specifically, the defendant argues that at the statutory sentencing hearing in this case the trial court considered immunized testimony of the defendant given at a prior independent criminal trial in the State of Iowa. The argument is that the court based its finding of the aggravating circumstance that the defendant had "a substantial history of serious assaultive or terrorizing criminal activity" and imposition of the death penalty upon that immunized testimony in the Iowa case. Defendant asserts that he was thus deprived of his constitutional privilege against self-incrimination, protected by his grant of immunity. He also contends that the aggravating and mitigating circumstances of the Nebraska death penalty statutes were improperly applied.

In 1978 Charles O. Reese was charged with the first degree murder of Charles Dean Sallis in the State of Iowa. The defendant in the present case was granted immunity under Iowa law in exchange for his testimony against Reese. That immunized testimony was introduced in evidence at the sentencing hearing in the present case to determine whether the death penalty should be imposed.

Neb. Rev. Stat. § 29-2523 (Reissue 1979) defines the aggravating and mitigating circumstances to be considered by the court in determining whether the death penalty should be imposed. Aggravating circumstance (1)(a) is: "The offender was previously convicted of another murder or a crime involving the use or threat of violence to the person, or has a substantial history of serious assaultive or terrorizing criminal activity."

The court found that no evidence had been submitted that the defendant had previously been con-

victed of either another murder or a crime involving the use or threat of violence to the person, and that the first portion of subsection (1)(a) was not applicable in the present case. The court excluded a Michigan conviction in 1968 for mutilating or defacing a dead body, and a 1964 Indiana conviction for theft.

The court specifically found that the defendant's immunized testimony established that, although the defendant in this case was not the actual killer in the Iowa case, "he was clearly liable, but for the State of Iowa's grant of immunity, as an aider and abettor to first degree murder."

The court then held that the second clause of aggravating circumstance (1)(a) was clearly applicable beyond a reasonable doubt based upon the defendant's previous involvement in the Iowa murder reflected by the immunized testimony. The court specifically held that the defendant's conduct in the Iowa case, set out by his immunized testimony, constituted "a history of assaultive or terrorizing criminal activity which is both 'substantial' and 'serious.'"

Aggravating circumstance subsection (1)(e) is: "At the time the murder was committed, the offender also committed another murder." The court specifically found that aggravating circumstance (1)(e) was clearly applicable.

The court also found that none of the other statutory aggravating circumstances were applicable and that none of the statutory mitigating circumstances were applicable.

The court concluded that the presence of a substantial history of serious assaultive or terrorizing criminal activity, as reflected by the defendant's immunized testimony, and the fact that the defendant also committed another murder at the time the murder of Tina Speese was committed were, together, sufficient to justify imposition of a death sentence.

The court also determined that the nonstatutory

mitigating factors presented by the defendant were not of sufficient weight to approach or exceed the weight given the aggravating circumstances, and that the sentence of death in this case was not excessive or disproportionate to the penalty imposed in similar cases. The sentencing court then imposed a death sentence on the defendant for the murder of Tina Speese.

The Nebraska statute governing immunity in effect at the time was Neb. Rev. Stat. § 29-2011.01 (Reissue 1979). That statute provided in relevant part: "No person who testifies or produces evidence in obedience to the command of the court in such case shall be liable to any forfeiture or penalty for or on account of any transaction, matter or thing concerning or arising from that as to which he may so testify or produce evidence; nor shall such testimony *or evidence be used directly or indirectly in any proceedings against him* except that no person shall be exempt from prosecution and punishment for perjury or contempt committed in so testifying." (Emphasis supplied.)

The current statute in relevant part provides: "The witness may not refuse to comply with such an order of the court on the basis of the privilege against self-incrimination, but no testimony or other information compelled under the court's order, or any information directly or indirectly derived from such testimony or other information, may be used against the witness in any criminal case, except in a prosecution for perjury, giving a false statement, or failing to comply with the order of the court." Neb. Rev. Stat. § 29-2011.02 (Cum. Supp. 1982).

The Iowa statute under which the defendant was granted immunity is more specific. It provides in part: "Testimony, documents or evidence which has been given by a witness granted immunity shall not be used against the witness in any trial or proceeding, or subject the witness to any penalty or

forfeiture . . . ." Iowa Code Ann. § 813.2, Rule 19.3.a.(4) (West 1979).

Under the specific language of the Iowa statute a sentencing hearing to determine whether a death sentence should be imposed is clearly a "proceeding," and it is difficult to imagine any penalty or forfeiture more severe than death. It seems equally clear that a sentencing hearing is an integral part of a "criminal case."

In order to be constitutionally adequate, the immunity granted by a state to a witness in a criminal case must afford protection to the witness extending to criminal proceedings by other states, or by the United States. *Murphy v. Waterfront Comm'n.,* 378 U.S. 52, 84 S. Ct. 1594, 12 L. Ed. 2d 678 (1964).

The aim of the *Murphy* rule is to leave the witness and the federal government, or another state government, in substantially the same position as if the witness had claimed his constitutional privilege against self-incrimination, in the absence of a state grant of immunity. "This purpose can be achieved only if the Federal Government is forbidden not only to introduce the testimony as evidence or to obtain investigatory leads from it, but is also forbidden to see it." *United States v. McDaniel,* 449 F.2d 832, 837 (8th Cir. 1971).

The broad scope of a grant of immunity is also demonstrated by cases holding that testimony compelled under the protection of immunity cannot be used against a witness for impeachment purposes. See, *United States v. Herring,* 602 F.2d 1220 (5th Cir. 1979); *United States v. Moss,* 562 F.2d 155 (2nd Cir. 1977), *cert. denied* 435 U.S. 914, 98 S. Ct. 1467, 55 L. Ed. 2d 505 (1978).

It is clear that immunity statutes are designed to serve as substitutes for the fifth amendment right not to incriminate oneself. Without such statutes no person in a criminal case can constitutionally be compelled to testify.

It is also clear that the only true test of the consti-

tutionality of an immunity statute is whether the result under such a statute is the same as if the witness retained his fifth amendment right and did not testify. The constitutional right would be illusory indeed if testimony produced under a grant of immunity could later be used as evidence of an aggravating circumstance supporting the imposition of a death penalty in a later criminal case against him.

We have found only one case directly dealing with testimony given under a grant of immunity at a previous trial in connection with the sentencing of the immunized witness at a subsequent criminal trial. In *People v. Provost,* 77 Mich. App. 667, 674-75, 259 N.W.2d 183, 186-87 (1977), the Michigan Court of Appeals said: "Defendant's final claim concerns his sentencing. Defendant had previously given testimony under a grant of immunity at a trial conducted before the same trial judge as in the case at bar. That testimony contained statements which would have incriminated defendant in the prior crime were it not for the immunity. Defendant moved to have the judge disqualify himself from sentencing defendant here on the basis of his knowledge of the previous testimony. The judge refused to disqualify himself and stated expressly that he would take the testimony into consideration for this sentence. Given the wide berth of information that a trial court in Michigan can consider in sentencing, we find no error in this court's actions. Under *People v. Grimmett,* 388 Mich 590, 202 NW2d 278 (1972), a sentencing court may consider 'public records concerning the defendant' and 'defendant's admissions to the court'. 388 Mich at 608 [202 N.W.2d at 287]. Since any judge rendering the sentence could have considered the public record of defendant's prior testimony, there was no reason for the trial judge below to disqualify himself or ignore that testimony."

The Supreme Court of Michigan reversed the Court of Appeals and remanded the case to the trial court for resentencing by another judge, and held

that the sentencing judge may not consider defendant's participation in the earlier crime in connection with which defendant received a grant of immunity. *People v. Provost,* 403 Mich. 843, 271 N.W.2d 777 (1978). The basic principle is even more obviously applicable where a death sentence is involved.

We therefore hold that where the defendant has testified in a previous criminal case under a lawful grant of immunity, the sentencing court in a subsequent criminal case cannot consider such testimony or any information directly or indirectly derived from it in determining whether a death sentence should be imposed under the provisions of § 29-2523 and related statutes.

In view of this holding, there was no evidence to support the finding of the sentencing court that aggravating circumstance (1)(a) was applicable in the present case. The death sentence must therefore be vacated and the cause remanded for resentencing.

The conviction and life sentence of the defendant for the murder of Ann L. Speese is affirmed. The conviction of the defendant for the murder of Tina M. Speese is affirmed; the sentence of death is vacated and the cause is remanded to the District Court with directions to hold a new sentencing hearing and sentence the defendant in accordance with the provisions of Neb. Rev. Stat. §§ 29-2520 et seq. (Reissue 1979) and this opinion.

AFFIRMED IN PART, AND IN PART REMANDED
WITH DIRECTIONS FOR RESENTENCING.