STATE OF NEBRASKA, APPELLEE, V. PATRICK BRIAN
LYNCH, APPELLANT.

340 N.W.2d 128

Filed November 4, 1983. No. 83-032.

Douglas W. Thomson of Thomson & Hawkins, for appellant.

Paul L. Douglas, Attorney General, and Terry R. Schaaf, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

SHANAHAN, J.

Patrick B. Lynch was charged with first degree murder, namely, homicide with deliberate and premeditated malice or in the perpetration of a robbery. Neb. Rev. Stat. § 28-303 (Reissue 1979). In a jury trial Lynch was acquitted of homicide during the perpetration of a robbery but was convicted of homicide with deliberate and premeditated malice. After his conviction and sentence to life imprisonment in the Nebraska Penal and Correctional Complex, Lynch appeals to this court. We affirm.

The homicide victim, age 57, lived in West Omaha. The victim's daughter, age 20, attended university on the east coast and returned home on December 31, 1981, to stay with her father and share a two-bedroom apartment. In 1980 the victim had informed his daughter that he was a homosexual, and was quite open about his homosexuality.

In the early evening hours of January 2, 1982, the victim went to the home of one of his homosexual acquaintances, viewed pornographic films, and drank wine. Around 9:30 p.m., the victim returned to his apartment, and having informed his daughter that he was "going to go out and see what was going on," left the apartment at 10 o'clock. After her father had left the apartment, the daughter went to her bedroom, shut the door, and went to bed.

Lynch, who had ridden from downtown to West Omaha in the pickup of an "older gentleman," was hitchhiking for return to downtown Omaha. The victim, alone and driving toward downtown, offered Lynch a ride. Lynch accepted, and in the course of

the trip informed the victim that he was "down on his luck." The victim indicated that there might be some money for Lynch, if Lynch wanted to be the victim's "friend for a while." Lynch responded that this would be "fine," and the pair proceeded to the victim's apartment. Upon arrival at the victim's apartment complex, Lynch felt that the victim was acting "a little weird." After Lynch had opened a pocketknife which he carried with him, the two entered the building and went to the victim's apartment on the fourth floor.

During the absence of her father that evening, the victim's daughter had remained in her bedroom but had not fallen asleep. At approximately 10:40 p.m. the daughter heard the voices of two people entering the apartment. She recognized the voice of her father. After entering the apartment Lynch and the victim walked down a hallway to the living room, where the victim offered a drink to Lynch. The two then went to the victim's bedroom and the door was closed. In the bedroom the victim disrobed and invited Lynch to engage in sexual acts. When Lynch declined, the victim put his naked body against Lynch. From his pocket Lynch pulled the pocketknife and stabbed the victim once in the chest. When that wounding did not "stop" the victim, Lynch stabbed the victim in the neck. The victim fell bleeding to the floor. Lynch watched for a while, thought the victim was dead, and started to leave. As Lynch was leaving the bedroom, the victim reached up to grab Lynch. A struggle followed, during which Lynch stabbed the victim several additional times. According to Lynch, "I just slit his throat, man."

During this episode, the victim's daughter had remained behind the closed door of her bedroom. Approximately 10 minutes after Lynch and the victim had entered the bedroom, the daughter heard a "thump" on her father's bed and heard "someone groaning." The daughter surmised "they were hav-

ing sex." The groans stopped and were followed by about 5 minutes of silence, when the daughter heard her father's voice: "You're killing me, you sonofabitch." About "a minute later" a hall light came on. Someone was operating the shower in the bathroom adjacent to the victim's bedroom. Hearing someone go back into her father's bedroom, the daughter opened her bedroom door and saw her father lying "in the doorway of his bedroom." Her father's naked body was covered with blood, and was not moving. While someone was "rustling" in her father's bedroom, the girl left and ran to a neighbor's apartment to call the police.

Ten minutes after the daughter had left the apartment, four uniformed policemen responded to the call. As the police approached the victim's apartment, the door was slightly ajar. Upon entering the apartment the police found Lynch in the hallway leading to the victim's bedroom. In the doorway of the bedroom the police discovered the wounded victim, with his throat cut "wide open." There was blood on the bottom of the victim's feet. Shortly after handcuffs had been applied to him, Lynch volunteered to an officer, "It's in my back pocket." The officer removed the pocketknife from the back pocket of Lynch's jeans. Also, a $20 bill was removed from Lynch. Throughout this time, Lynch was "real calm" and cooperative. Lynch also informed the police about a sack in the bathroom—a sack containing miscellaneous jewelry of the victim.

In his interview by the police Lynch never mentioned defending himself or being afraid, and did not mention any attempt to ward off advances made by the victim. Lynch did acknowledge that he received $20 from the victim that night at the apartment.

A pathologist testified concerning the cause of the victim's death. According to the pathologist, the external examination of the victim revealed "multiple cutting and stabbing wounds" about the neck, left side of the chest, and right side of the back. The

pathologist described the difference between a "cutting wound" and a "stabbing wound." A cutting wound was "longer than it is deep," and is inflicted in a more horizontal plane. A stabbing wound, deeper than it is long, has more penetration. There were four separate cutting wounds to the neck, which severed arteries and veins, including the jugular veins—principal veins carrying blood from the head and the neck. Severed jugular veins produce extensive bleeding. A stab wound was located in the lower right side of the neck. In addition to the five wounds in the neck, there was a stab wound in the left side of the chest which penetrated the right ventricle of the victim's heart and resulted in bleeding into the heart sac. The pathologist further observed a stab wound in the thorax, that is, in the upper right part of the victim's back. There were seven separate stabbing and cutting wounds and two fractures of costal cartilage of the victim's chest. Cause of death was "hemorrhage or bleeding due to multiple stabbing and cutting wounds of the neck and chest." The pathologist stated that the wounds in the neck and throat of the victim caused the loss of much blood and were "lethal," and that the wounds in either the victim's heart or in his throat could have been fatal. As summarized by the pathologist after describing the victim's wounds, "certainly the aggregate of all of the wounds are, in my opinion, lethal injuries." The victim was 5 feet 8½ inches tall and weighed 140 pounds. According to the pathologist, the knife taken from Lynch could have inflicted the wounds on the victim.

During the course of trial, counsel for Lynch objected to five photographs of the victim which were taken at the time of the autopsy. The objection was based on irrelevancy and the inflammatory nature of the photographs. The pathologist referred to these photographs in the course of his testimony about the nature and location of the wounds and the cause of death.

Lynch did not testify, and rested his case immediately after the conclusion of the State's case. The jury returned a verdict of guilty to the charge of homicide with deliberate and premeditated malice. After considering evidence regarding the aggravating and mitigating circumstances of the crime, the trial court imposed a life sentence on Lynch.

Lynch alleges four errors in connection with his trial: (1) The trial court's failure to grant a continuance; (2) The insufficiency of evidence concerning premeditation in his conviction of murder in the first degree; (3) The abuse of discretion by the trial court in admitting photographs of the victim at the time of the autopsy; and (4) The trial court's failure to give credit for the time Lynch was in custody awaiting trial and sentence.

Because the elements of murder in the first degree include "deliberate and premeditated malice," there is a mental process, namely, the subjective state of the perpetrator, which can be proved by circumstantial evidence. See, *State v. Beers*, 201 Neb. 714, 271 N.W.2d 842 (1978); *State v. Payne*, 205 Neb. 522, 289 N.W.2d 173 (1980). Concerning the element of premeditation, "the time required may be of the shortest possible duration. The time may be so short that it is instantaneous, and the design or purpose to kill may be formed upon premeditation and deliberation at any moment before the homicide is committed . . . ." *Savary v. State*, 62 Neb. 166, 170, 87 N.W. 34, 36 (1901). See, also, *State v. Nokes*, 192 Neb. 844, 224 N.W.2d 776 (1975).

In this case the evidence showed that Lynch entered the apartment after he had opened the closed blade of the pocketknife he was carrying. With that knife Lynch was in his victim's bedroom for a period of approximately 15 minutes. During that time, Lynch inflicted seven separate wounds upon his victim, namely, one in the back, another in the chest and heart, and five more on the neck, including both the right and left sides of his victim's throat. Also,

after the wounded victim had collapsed on the bedroom floor, Lynch renewed the assault during his departure from the bedroom. The butchery culminated in Lynch's description: "I just slit his throat, man." The location, nature, and number of wounds inflicted are circumstances from which the jury could and did draw the inference that Lynch, with "deliberate and premeditated malice," killed his victim. See, *Com. v. Almon*, 387 Mass. 599, 441 N.E.2d 758 (1982); *State v. Snowden*, 79 Idaho 266, 313 P.2d 706 (1957); *Sireci v. State*, 399 So. 2d 964 (Fla. 1981); *People v. Johnson*, 93 Mich. App. 667, 287 N.W.2d 311 (1979). The wounds were the windows of the mind through which the jury could see Lynch's subjectivity when he committed the act.

The State was required to prove that Lynch killed his victim with deliberate and premeditated malice, that is, provide proof of the cause of death and the mental elements of premeditation and malice regarding the homicide. If the photographs of the victim at the autopsy are relevant, such photographs, although gruesome, are admissible. See, *State v. Rowe*, 210 Neb. 419, 315 N.W.2d 250 (1982); *State v. Blackwell*, 184 Neb. 121, 165 N.W.2d 730 (1969). The police found a knife in Lynch's pocket when they apprehended him in the apartment. According to the pathologist, that knife could have been the instrument used to inflict the fatal wounds. The photographs tended to correlate the victim's wounds with Lynch's knife. Such evidence depicted by the photographs was relevant. See, *State v. Wilbur*, 186 Neb. 306, 182 N.W.2d 906 (1971); *State v. Jones*, 213 Neb. 1, 328 N.W.2d 166 (1982); *State v. Partee*, 199 Neb. 305, 258 N.W.2d 634 (1977).

The photographs also showed a wound extending from below the victim's left ear and running forward to the "Adam's apple," another wound on the left neck parallel to but below the wound just mentioned, an additional, deep wound on the right side of the victim's throat, still other wounds on the vic-

tim's throat, and additional wounds on the victim's back and chest. These photographs show a series of systematic, sadistic, and savage slashes in the victim's throat—visual proof from which a jury could reasonably infer that the homicide was committed with "deliberate and premeditated malice." See, *State v. Lester*, 294 N.C. 220, 240 S.E.2d 391 (1978); *Commonwealth v. Sullivan*, 472 Pa. 129, 371 A.2d 468 (1977). According to the pathologist, the cause of death was "bleeding due to multiple stabbing and cutting wounds of the neck and chest." Illustration of the wounds in conjunction with the pathologist's testimony, that is, the location, number, and nature of such wounds, supplied evidence to prove the cause of death assigned by the pathologist. Establishing the cause of death is indispensable in criminal homicide cases. Generally, relevant evidence regarding causation of death in homicide cases is admissible, and the photographs in question were admissible under the circumstances. See, *State v. Wilbur*, *supra*; *State v. Partee*, *supra*; *State v. Jones*, *supra*.

Gruesome crimes produce gruesome photographs. Gruesomeness by itself is not a sufficient reason to keep photographs from the jury, if the probative value of the photographs outweighs the possible prejudice to one accused of a crime. See *State v. Rowe*, *supra*. The photographs in this case had probative value regarding the elements of the charge which the State was required to prove against Lynch. Consequently, such photographs were admissible in this case.

Near the first of July 1982, Lynch's case was set for trial on July 12. Subsequently, in communications with the trial court, Lynch's counsel, Thomson, assured the trial court that he would be ready for trial on July 13 and July 15, respectively, but finally informed the court that he would not be able to commence trial until the week of July 19. Around July 12, defense counsel told the court that he would not

be able to try the case during the 2-week jury panel summoned in July 1982. As a result of conference calls with Lynch's counsel in Minnesota, the court and counsel agreed that trial would commence on September 27. On September 27 Thomson was occupied in a trial in Minnesota, although an associate in Thomson's firm did appear on September 27 for jury selection and requested a 24-hour continuance. Hawkins, the associate attorney who appeared on behalf of Thomson the morning of trial, had been working on the Lynch case with Thomson since early in 1982 and had appeared with Thomson at pretrial hearings on motions to suppress some of the State's prospective evidence. The State objected to the continuance, because there were problems either with travel or availability of witnesses. In denying the continuance the trial court undoubtedly took into consideration the previous continuance granted to accommodate Lynch's counsel; an agreed trial date; the presence of Lynch's counsel, who had participated in pretrial proceedings; and difficulty in the orderly presentation of the State's case in the event that a continuance were granted. An application for a continuance is addressed to the sound discretion of the trial court and any ruling thereon will not be disturbed, unless it appears that the rights of the defendant were prejudiced by the denial of the continuance. See *Kennedy v. State*, 171 Neb. 160, 105 N.W.2d 710 (1960). In this case there has been no prejudice demonstrated as a result of the trial court's denying the continuance, and, consequently, there is no merit to Lynch's claim of error in denial of the continuance.

Lynch claims that he is entitled to credit for the time in custody pending trial and sentence. Lynch is incorrect. First, any credit for time spent in custody pending disposition of a charge is a matter within the discretion of the trial court. See, *Addison v. Parratt*, 208 Neb. 459, 303 N.W.2d 785 (1981); *State v. Prosser*, 209 Neb. 766, 311 N.W.2d 525 (1981). Sec-

ond, the purpose of credit under Neb. Rev. Stat. § 83-1,106 (Reissue 1981) is to avoid the situation where one convicted of a crime is incarcerated for a period greater than the maximum term of years prescribed as punishment for the particular offense. In Lynch's case the sentence was life imprisonment. By its very nature the sentence is indefinite. It is not possible to determine the number of years which Lynch may live serving his life sentence. Consequently, Lynch's life sentence has no term of years from which time in custody can be deducted. In the case of a life sentence, it is impossible to impose punishment exceeding the term prescribed by statute. See, *State v. Makal*, 106 Ariz. 591, 480 P.2d 347 (1971); *Baynor v. Warden, Maryland House of Correction*, 391 F. Supp. 1254 (D. Md. 1975). There has been no abuse of discretion by the trial court regarding Lynch's sentence of life imprisonment.

The judgment and sentence of the District Court are affirmed.

AFFIRMED.