STATE OF NEBRASKA, APPELLEE, V. BEN WEST, APPELLANT.
388 N.W.2d 823

Filed June 20, 1986.    No. 85-685.

J. William Gallup, for appellant.

Robert M. Spire, Attorney General, and Lynne R. Fritz, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

HASTINGS, J.

Ben West appeals his conviction by jury of two counts of first degree murder, for which he was sentenced to concurrent life imprisonment terms on each count.

West assigns as errors: (1) The denial of his plea in abatement; (2) The denial of his motion to dismiss; (3) The sufficiency of evidence to prove first degree murder; (4) The admission of photographs of the female victim at the scene of the crime and during autopsy; and (5) The admission of evidence found after the illegal arrest of West and during the illegal search of the crime scene.

Since the third assignment of error is largely dispositive of the first two assignments, we first address the sufficiency of the evidence to prove first degree murder. Although West admits killing Maryetta (Mary) Rost and Jack (Doug) Weaver, he denies that the crime was committed with premeditation, an element of first degree murder. The question of premeditation is for the jury to determine. No particular length of time for premeditation is required, provided that the intent to kill is formed before the act is committed and not simultaneously with the act that caused the death. The time needed for premeditation may be so short as to be instantaneous; the intent to kill may be formed at any moment before the homicide is committed. State v. Benzel, 220 Neb. 466, 370 N.W.2d 501 (1985).

A review of the record indicates that there was sufficient evidence of premeditation for the jury to find West guilty of first degree murder despite West's denial of premeditation. In determining the sufficiency of the evidence to sustain a conviction, it is not the province of this court to resolve

conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or weigh the evidence. Such matters are for the trier of fact, and a verdict made by the trier of fact must be sustained if, taking the view most favorable to the State, there is sufficient evidence to support it. *State v. Benzel, supra*; *State v. Sutton*, 220 Neb. 128, 368 N.W.2d 492 (1985).

Not only did the State produce evidence of premeditation sufficient to sustain the conviction but it is apparent that certain conflicts between West's account of the incident and the physical evidence would have caused the jury to doubt West's credibility along with his denial of premeditation.

Competent evidence was admitted at trial to demonstrate the following facts: Ben West met Mary Rost in Estherville, Iowa, on June 29, 1984, while he was employed as an over-the-road truckdriver. When Rost moved to Omaha to attend nursing school, West found employment in Omaha and moved into an apartment with Rost on October 9. West spent Thanksgiving, November 22, at the home he maintained in Wahoo, while Rost entertained her ex-husband and two children overnight in Omaha for the holiday. After her guests left on Saturday, Rost attended a wedding in Wahoo and spent the night with West at his Wahoo home. The couple returned to their Omaha apartment separately on Sunday.

At 2:45 a.m. Monday, November 26, a neighbor in the apartment building saw Doug Weaver from Estherville, Iowa, in the hallway and heard him calling out softly to Rost. Rost answered the door, reentered the apartment, dressed, told West she was going to talk with Weaver, and, finally, left the building laughing, with Doug Weaver's arm around her. When West awoke at 4 a.m., Rost had not returned, and did not return before he left for work. West started to write a note to Rost but changed his mind. West worked from 6 a.m. to 2 p.m. and returned to the apartment.

Again, there was no one in the apartment when West arrived, but Rost had left a note: "dear Ben, the clothes . . . Doug will be going home this evening. I'll call you. Love, Mary." (Emphasis and ellipsis in original.) At trial West testified that he did not understand the "cryptic" note. However, a possible

explanation of the note is suggested by the testimony of Rost's ex-husband that he searched the apartment for men's clothing on Friday, November 23, finding none; but when he returned to the apartment on November 27, after Rost's death, he found West's clothing in a dresser he had searched 4 days earlier. West denied having moved the clothes himself.

Jim Rost, the victim's former husband, also testified that he left some money in the apartment when he left with the children on Saturday morning. Mary found it later and called to thank him on Sunday morning. This may have been the money West referred to in the note he wrote in response:

Dear Mary,

No clothes. No Doug. Was he supposed to have been sleeping here, or something? I don't remember leaving $20.00 under your earing [sic] box.

(over)

I need to get to the courthouse in Wahoo, yet today. Will be home here 5-6 p.m. Love Ben.

(Emphasis in original.) These two notes were found in the kitchen wastebasket on December 15.

West drove to his Wahoo home, which takes 30 to 45 minutes; picked up his mail at a neighbor's; and went to the courthouse to register a deed. Betty Patzloff, the Saunders County assessor, saw West at the courthouse "sometime after three o'clock," and the register of deeds noted on the document that it was filed at 4 p.m. on November 26, 1984.

West drove the 30- to 45-minute return trip to the Omaha apartment and, according to his testimony, had a conversation there with Rost concerning Doug Weaver, his fight with his wife, and some sausages that were spoiling in Rost's refrigerator. West testified further that he then left the apartment, went to the nearby Guns Unlimited to check a sale he had seen advertised in the Sunday newspaper, and shopped at ShopKo and Ace Hardware for a rubber mallet. West testified that it was only when he returned to the apartment for the night and found Rost and Weaver together that he had any idea that Rost was not alone. He had assumed that Weaver returned to Iowa earlier in the day.

However, the cash register receipt for the Winchester-

Western .38 Special caliber "round nose" cartridges West purchased at Guns Unlimited showed that the transaction took place at 4:40 p.m., and a fellow resident of the apartment building, Steven Apfel, testified that he saw a tall man dressed in a green jacket in the Rost-West apartment at 5 p.m. when Apfel returned home from work. The green fatigue jacket West wore when he was arrested was admitted into evidence.

These time constraints and other evidence tend to show that the more likely course of events is that upon returning to the apartment early, West observed Rost's and Weaver's vehicles parked side-by-side in front of the apartment building. His suspicion already aroused by Rost's early morning departure and her later note, West drove to Guns Unlimited without confronting them. After purchasing cartridges that fit the Ruger Model Service-Six .357 Magnum revolver he carried in his pickup, West returned to the parking lot of the Citadel apartment complex but parked in front of another building one-tenth mile away from and out of sight of the Rost-West apartment. He parked in that location even though there were parking spaces available near the apartment.

West removed the revolver from its box, and finding a cartridge case containing six hollow-point bullets, he loaded the handgun with those more destructive bullets and placed it in the waistband of his trousers under his fatigue jacket. Although West explained that he was taking the gun into the house simply because he was not planning to go out to his vehicle again that evening, other important items were left in the pickup, including the cartridges he had just purchased, the box he kept the handgun in, the lunchbox he took to work daily, a briefcase containing banking and personal papers, and a zippered portfolio. These items were left neatly behind despite West's complaints of recent vandalism in the parking lot.

When he entered the apartment, West found Rost and Weaver engaged in sexual intercourse in the bedroom. West testified that the three exchanged words, and at one point, when Rost approached West, he pushed her back on the bed. West testified further that his handgun was not visible to Rost or Weaver until Weaver asked for more time alone with Rost. West explained that he lost control upon hearing that request. West

emptied his handgun, firing two shots into Weaver and four into Rost. At about 5:15 p.m. Steven Apfel, in the apartment above, heard "several sharp tapping noises" and a thud. Both of Weaver's wounds and three of Rost's wounds would have proved fatal if sustained alone.

At 5:34 p.m. Ben West called the 911 operator and reported that he had shot his girlfriend and "another guy." He did not report that the shooting victims were dead; rather, he asked the operator to hurry and send help. Law enforcement officers arrived, and an operator called West back asking him to open the front door of the apartment. At the door an officer ordered West to step outside. West complied and was taken into custody. When the officers asked whether anyone else was inside, West replied that he had shot the victims in the apartment. The officers entered the apartment and found the handgun in plain view on the kitchen table and the victims in the bedroom. A rescue squad member was allowed in the apartment to verify the victims' deaths.

About 15 to 20 minutes after the officers arrived, the defendant became incoherent, shaking his head and repeating "No." Eventually, West was taken to the hospital and committed for psychiatric observation. Officers took possession of West's fatigue jacket at the hospital and found an empty cartridge case, or "ammo wallet," in the pocket.

The bullets recovered in autopsies were Remington-Peters .38 Special caliber Plus-P hollow points. Hollow-point bullets are designed to expend all of their energy in the target rather than passing through. They have more "killing power" theoretically. The ammunition purchased at Guns Unlimited on November 26 was unopened and left in West's pickup.

According to West's testimony, Weaver was lying on his back when West entered the apartment and remained on his back throughout the confrontation, rising to his elbow while they talked. Weaver's body was found lying diagonally on the bed on its back. However, the autopsy of Weaver showed that one bullet entered the chest under his left arm, passing straight across the chest through both lungs and the heart, coming to rest just beneath the skin under the right nipple. The other bullet entered the back of the left side of the chest, to the right of

the left shoulder blade, striking the heart and lodging itself beneath the skin under the left nipple. Since West was at the foot of the bed when he entered the bedroom, it is difficult to understand how Weaver sustained the gunshot wounds he did while lying on his back.

Although the evidence is in conflict, the State produced sufficient evidence of premeditation for the jury to disbelieve West's denial of intent or premeditation and to convict the defendant of first degree murder. Having decided that the State produced sufficient evidence to sustain West's conviction for first degree murder, it is immediately evident that the trial court properly overruled the defendant's motion for dismissal at the close of the State's case in chief.

In a prosecution in which the State introduces competent evidence which, if believed by the jury, is sufficient to establish all elements of crimes charged against the defendant, denial of the defendant's motion to dismiss is without error. *State v. Hurlburt*, 218 Neb. 121, 352 N.W.2d 602 (1984). West's second assignment of error is without merit.

Also assigned as error was the trial court's failure to sustain the defendant's plea in abatement, which was based on a lack of evidence of premeditation at West's preliminary hearing. It is the general rule that any error by the district court in ruling on a plea in abatement is cured by a subsequent finding by the jury of guilt beyond a reasonable doubt. *State v. Schmidt*, 213 Neb. 126, 327 N.W.2d 624 (1982); *State v. Brehmer*, 211 Neb. 29, 317 N.W.2d 885 (1982); *State v. Lehman*, 203 Neb. 341, 278 N.W.2d 610 (1979). Thus our conclusion that the State produced sufficient evidence to support the verdict rendered by the jury obviates a separate review of the evidence presented at the preliminary hearing.

West does not appeal the admission of photographs of Doug Weaver taken both at the crime scene and at autopsy, apparently recognizing that those photographs served to demonstrate the location of the body, the trajectory of the bullets, and to reconstruct in part the final moments of Weaver's and Rost's lives. Notably, the photographs of Weaver's body and the pathologist's expert testimony proved inconsistent with West's account of the confrontation.

West does appeal, however, the admission of photographs of Mary Rost's body, claiming that those photographs were gruesome and inflammatory. Although the photographs are somewhat gruesome, they are no more gruesome than those of Weaver's body, and their admission was not error. The mere fact that they did not prove inconsistent with the defendant's testimony does not discount their value to the jury. The photographs of Rost's body, just as those of Weaver's body, helped the jury to visualize the crime and view described events in the proper context. The fact that a photograph might present a gruesome spectacle does not prohibit its admission in evidence. *State v. Lynch*, 215 Neb. 528, 340 N.W.2d 128 (1983).

In a homicide case photographs of the victim, upon proper foundation, may be received in evidence for purposes of identification, to show the condition of the body, the nature and extent of the wounds and injuries, and to establish malice or intent. *State v. Rife*, 215 Neb. 132, 337 N.W.2d 724 (1983); *State v. Kuntzelman*, 215 Neb. 115, 337 N.W.2d 414 (1983). Particularly in conjunction with testimony by the examining pathologist, the photographs of Rost's body served these purposes.

In his final assignment of error West contends that he was arrested illegally and that the subsequent entry into and search of the Rost-West apartment was also illegal. He claims that any evidence acquired in the arrest should have been suppressed as "fruit of the poisonous tree" under *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). We disagree. The law enforcement officers arriving at the scene would have been derelict in their duties had they not arrested West and entered the apartment.

It is now axiomatic that a nonconsensual, warrantless entry to arrest a person within his or her home is presumptively unreasonable and unconstitutional in the absence of exigent circumstances. *State v. Hert*, 220 Neb. 447, 370 N.W.2d 166 (1985). We have held, however, that exigent circumstances are established when a law enforcement officer has:

(1) Probable cause to believe that a suspect has committed a serious offense;

(2) A reasonable belief from a present factual basis that

the suspect is in the premises to be entered; and

(3) Immediately upon concurrence of elements (1) and (2) (probable cause and reasonable belief), a factual basis to reasonably believe that, during the time which would be necessarily consumed in obtaining an arrest warrant under existing circumstances, there will be danger to the officer or another, evidence will be removed or destroyed, or the suspect will escape.

*State v. Hert, supra* at 453-54, 370 N.W.2d at 171.

The information the officers had to work with when they arrived at the Rost-West apartment clearly satisfied this three-prong test. They knew a shooting had occurred and that the assailant was still in the apartment. Since West asked that help be sent quickly, there was every reason to believe that the shooting victims were still alive and in need of immediate assistance. The arrest of West was proper under the exigent circumstances.

The appellant does not specify the evidence he considers to be "fruit of the poisonous tree" as a result of the allegedly illegal arrest. While we will not speculate in that regard, we reiterate that the arrest was perfectly legal and no "fruit" was poisoned by it. Once the officers had gained entry to the apartment to arrest West and to attempt to rescue the victims, they were legitimately in a position such that the murder weapon was in plain view. The handgun was properly seized under those circumstances and was admissible evidence at trial. An officer may seize evidence and contraband which is in "plain view" without a warrant if he has the right to be in the position where he has such a view. Such activity does not constitute a search. *State v. Searles*, 214 Neb. 849, 336 N.W.2d 571 (1983). See, also, *State v. Hinchey*, 220 Neb. 825, 374 N.W.2d 14 (1985).

The judgment of the district court is affirmed.

AFFIRMED.