STATE OF NEBRASKA, APPELLEE, V. CHRISTOPHER M. MASTERS, APPELLANT.

524 N.W.2d 342

Filed December 2, 1994.   No. S-94-150.

Thomas M. Kenney, Douglas County Public Defender, and Thomas C. Riley for appellant.

Don Stenberg, Attorney General, and Delores Coe-Barbee for appellee.

HASTINGS, C.J., WHITE, CAPORALE, FAHRNBRUCH, LANPHIER, and WRIGHT, JJ., and BOSLAUGH, J., Retired.

FAHRNBRUCH, J.

Christopher M. Masters appeals his convictions and sentences for first degree felony murder and for use of a firearm in the commission of a felony in the execution-style shotgun killing of 15-year-old Jeremy Drake.

We affirm Masters' convictions and sentences but remand the cause to the district court with direction to give Masters credit on his firearm sentence for the time he served prior to sentencing.

## STANDARD OF REVIEW

A conviction in a bench trial of a criminal case is sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support that conviction. *State v. Hand*, 244 Neb. 437, 507 N.W.2d 285 (1993).

In determining whether evidence is sufficient to sustain a conviction in a bench trial, an appellate court does not resolve conflicts in evidence, pass on credibility of witnesses, evaluate explanations, or reweigh evidence presented, which are within a fact finder's province for disposition. *Id.*

A trial court's findings have the effect of a jury verdict and will not be set aside unless clearly erroneous. *Id.*

## FACTS

On October 8, 1992, Jeremy Herman telephoned Drake and asked Drake to meet him at a gas station on the pretext that they would obtain marijuana and smoke it together. Herman believed that Drake was involved in the recent theft of Herman's car stereo speakers or knew who was involved. Drake and Herman had at one time been close friends, but had been estranged for several months at the time of the events at issue herein.

Before arranging the meeting with Drake, Herman attempted to borrow a sawed-off shotgun from Masters, a recent acquaintance of Herman. Masters refused to loan the shotgun to Herman, but agreed to go with Herman to meet Drake. Herman testified that Masters stated at that time that "if he [Masters] was going to point his gun at anybody, he was going to plan on using it." Driving his own car, Herman picked up Masters prior to meeting Drake, and Masters brought the shotgun along in a cloth carrying case.

Herman and Masters met Drake at the predetermined gas station. Masters got out of the car so Drake could get into the backseat of the two-door vehicle. Herman drove to Hanscom Park, where Masters unsheathed the gun, displayed it to Drake, and questioned him about the theft. Drake initially indicated he knew nothing.

While Masters was pointing his sawed-off shotgun at Drake, Herman heard Masters strike or slap Drake, causing the

victim's contact lens to fall out of his right eye. Masters showed Drake that his shotgun was loaded and threatened " 'to blow [Drake's] guts all over the back seat of [the] car' " unless he talked. Herman testified that Drake was scared, that he had a "stunned look" on his face after being struck by Masters, and that at one point Drake was crying.

Drake finally stated that a Bobby Baratta had taken the speakers and directed Herman to Baratta's house. Herman talked briefly to Baratta while Drake and Masters remained in Herman's vehicle. Baratta testified that, at some point, Masters got out of the vehicle holding something which he thought was a weapon and shouted at Baratta. Shortly thereafter, Herman and Masters left Baratta's house with Drake, and Herman drove to Hummel Park, during which time Herman and Masters, in Drake's presence, discussed whether to let Drake go or to kill him.

At Hummel Park, Masters directed Herman to a place called Lookout Point. All three males exited the vehicle. Masters and Drake walked down a path together into the woods. Masters carried his sawed-off shotgun. Herman testified that he stayed back to watch for other vehicles.

After several minutes of silence, Herman heard a gunshot which he thought had come from Masters' gun and ran to investigate. Herman was met by Masters, who said that he had accidentally shot Drake and that Drake was dead.

Shannon Shaw, an individual who lived with Masters' family, testified that later that evening of October 8 or early October 9, Masters took him to Hummel Park and showed him Drake's body. Shaw testified Masters said that he had instructed Drake to get down on his hands and knees, kneeling on the ground with his hands behind his head, and that Masters had shot Drake in that position.

A pathologist testified that the cause of death was a shotgun wound to the left posterior lateral back and that the angle of the shot was consistent with Drake having been shot from the back while on his hands and knees.

Masters was originally charged by information with first degree premeditated murder, felony murder, and use of a firearm in the commission of a felony. Before trial, the State

was permitted to delete the charge of premeditated murder. On the murder of Drake, the State relied solely on a charge of murder in the commission of a kidnapping.

Masters waived his right to a jury trial and, after a bench trial, was found guilty of murder in the commission of a kidnapping and use of a firearm to commit a felony. The court sentenced Masters to life imprisonment for the felony murder conviction and to $6^1/3$ to 20 years' imprisonment for the firearm conviction, those terms to be served consecutively. Over defense counsel's objection, Masters was given no credit for time served.

Masters timely appealed to this court.

## ASSIGNMENTS OF ERROR

Masters claims that the trial court erred in (1) finding him guilty of first degree felony murder because there is insufficient evidence upon which to find that he killed Drake while in the commission of a kidnapping as defined in Neb. Rev. Stat. § 28-313 (Reissue 1989), (2) refusing to consider the lesser-included offense of manslaughter, and (3) refusing to grant him credit for time served while incarcerated prior to sentencing.

## ANALYSIS

### SUFFICIENCY OF EVIDENCE

Masters claims that the evidence was insufficient for the trial court to find him guilty of kidnapping Drake. Masters argues that his actions instead constituted false imprisonment in the first degree.

According to § 28-313(1), "[a] person commits kidnapping *if he abducts another* or, having abducted another, *continues to restrain him with intent to . . . [t]errorize him* or a third person . . . ." (Emphasis supplied.)

"A person commits false imprisonment in the first degree if he *knowingly restrains or abducts another person (a) under terrorizing circumstances* or under circumstances which expose the person to the risk of serious bodily injury . . . ." (Emphasis supplied.) Neb. Rev. Stat. § 28-314(1) (Reissue 1989).

The terms "abduct" and "restrain" are defined by Neb. Rev.

Stat. § 28-312 (Reissue 1989) as follows:

(1) *Restrain* shall mean *to restrict a person's movement* in such a manner as to interfere substantially with his liberty:

(a) *By means of force, threat, or deception . . .*

. . .

(2) *Abduct* shall mean to *restrain a person with intent to prevent his liberation* by:

. . .

(b) Endangering or *threatening to endanger the safety of any human being.*

(Emphasis supplied.)

The evidence reflects that Masters, armed with a sawed-off shotgun, restrained Drake's movements by keeping him in the back seat of a two-door vehicle, which was often moving during this episode. Masters accomplished this restraint through the use of force against Drake, striking Drake in the face hard enough to knock Drake's contact lens out of his right eye. Masters held Drake at gunpoint while questioning him, showed him that the gun was loaded, and threatened to " 'blow [Drake's] guts all over the back seat' " of the car if Drake failed to cooperate. The foregoing is ample evidence from which the trier of fact could conclude beyond a reasonable doubt that Masters restrained Drake both by means of force and by means of threats.

Moreover, this same evidence is sufficient for the trier of fact to conclude beyond a reasonable doubt that Masters abducted Drake, that is, Masters restrained Drake with the intent to prevent his liberation by threatening to endanger Drake's safety. This conclusion is further supported by Herman's testimony that he and Masters deliberated in Drake's presence whether to liberate Drake or to kill him, after which Masters ultimately killed Drake.

Finally, there is sufficient evidence from which the trier of fact could conclude beyond a reasonable doubt that Masters abducted and restrained Drake *with the intent to terrorize him.* It is the *intent to terrorize* which distinguishes kidnapping from false imprisonment in the first degree. See *State v. Miller,* 216 Neb. 72, 341 N.W.2d 915 (1983) (holding that kidnapping

requires proof of a specific intention which is not an element of false imprisonment).

In this case, it is abundantly clear that Master's sole purpose for being in Herman's vehicle was to terrorize Drake. Herman testified that he had originally attempted to borrow Masters' sawed-off shotgun because he thought he "might need it to scare [Drake]." Although Masters refused to lend Herman his sawed-off shotgun, he agreed to bring the shotgun and accompany Herman.

During the course of events leading to Masters' shooting of Drake, Masters kept his weapon pointed at Drake for much of the time, showed Drake that the weapon was loaded, struck Drake in the face, threatened " 'to blow [Drake's] guts all over the back seat' " unless Drake talked, and discussed with Herman whether they should leave Drake in Hummel Park or kill him. Once at Hummel Park, Masters walked Drake down a secluded path into the woods and instructed him to kneel, the position in which Drake was then shot by Masters.

"Intent" is the state of the actor's mind when the actor's conduct occurs. *State v. Rokus*, 240 Neb. 613, 483 N.W.2d 149 (1992). The intent operative at the time of an action may be inferred from the words and acts of an accused and from the facts and circumstances surrounding the conduct. *State v. Meyer*, 236 Neb. 253, 460 N.W.2d 656 (1990). The trier of fact could infer beyond a reasonable doubt from the words and acts of Masters and from the facts and circumstances surrounding Masters' conduct throughout Drake's ordeal that Masters intended to terrorize Drake.

There was sufficient evidence from which a trier of fact could conclude beyond a reasonable doubt that Masters was guilty of abducting Drake, that he restrained Drake, and that he did so with the intent to terrorize Drake. Thus, there was sufficient evidence from which the trier of fact could find beyond a reasonable doubt that Masters shot and killed Drake during the commission of a kidnapping. Master's first assignment of error is without merit.

### LESSER-INCLUDED OFFENSE
Next, Masters contends that the trial court erred in refusing

to consider the lesser-included offense of manslaughter. As previously noted, Masters was tried on a charge of felony murder, the charge of premeditated murder having been deleted from the information by the State before trial. The court announced that it would confine its deliberations to the theory of murder left in the information at the time of trial.

Any murder in the perpetration of or attempt to perpetrate a sexual assault in the first degree, arson, robbery, kidnapping, hijacking, or burglary is murder in the first degree. See Neb. Rev. Stat. § 28-303(2) (Reissue 1989). It has long been the law in this state that manslaughter is not a lesser-included offense to the crime of felony murder. See *Morgan v. State*, 51 Neb. 672, 71 N.W. 788 (1897).

When an information charges a defendant with a felony murder, it charges only murder in the first degree, and it is error for the trial court to instruct the jury that it may find the defendant guilty of murder in the first degree, guilty of murder in the second degree, or guilty of manslaughter. See, e.g., *State v. Ruyle*, 234 Neb. 760, 452 N.W.2d 734 (1990) (homicide in the perpetration of an arson); *State v. Reeves*, 216 Neb. 206, 344 N.W.2d 433 (1984), *cert. denied* ____ U.S. ____, 113 S. Ct. 114, 121 L. Ed. 2d 71 (1992) (homicide committed in perpetration of or attempt to perpetrate a first degree sexual assault); *State v. Hubbard*, 211 Neb. 531, 319 N.W.2d 116 (1982) (homicide committed in perpetration of or attempt to perpetrate a robbery); *State v. McDonald*, 195 Neb. 625, 240 N.W.2d 8 (1976) (homicide committed in perpetration of a robbery); *Garcia v. State*, 159 Neb. 571, 68 N.W.2d 151 (1955) (homicide committed in perpetration of a robbery).

"Second degree murder or manslaughter are [sic] included within a regular charge of first degree murder because the mental state of the defendant determines the degree of the crime. In a felony murder case, the proof of a particular mental state is not required as to the killing." *McDonald*, 195 Neb. at 636-37, 240 N.W.2d at 15.

Thus, had Masters asserted his right to trial by jury, it clearly would have been error for the trial court to instruct the jury that it could consider manslaughter as a lesser-included offense. Similarly, it would have been error for the trial court, in its

capacity as finder of fact at Masters' bench trial, to consider manslaughter as a lesser-included offense of felony murder. In fact, in *Thompson v. State*, 106 Neb. 395, 184 N.W. 68 (1921), this court reversed the defendant's conviction for manslaughter because the information charged the defendant with only homicide in the attempted perpetration of a robbery, and the information was therefore insufficient to sustain the verdict.

Masters cites *Beck v. Alabama*, 447 U.S. 625, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980), and *Schad v. Arizona*, 501 U.S. 624, 111 S. Ct. 2491, 115 L. Ed. 2d 555 (1991), as authority for the proposition that lesser-included offenses to felony murder must be considered by the finder of fact. Both of these cases are distinguishable on their facts.

In *Beck*, an Alabama jury was given the alternative of finding a defendant guilty of the capital crime of robbery-intentional killing *and* imposing the death penalty or finding the defendant not guilty. The trial court refused to give a requested lesser-included offense jury instruction.

The issue before the U.S. Supreme Court was whether a sentence of death could be constitutionally imposed after a jury verdict of guilt of a capital offense when the jury was not permitted to consider a verdict of guilt of a lesser-included noncapital offense and when the evidence would have supported such a verdict. The Court held that the death penalty could not be constitutionally imposed under those circumstances.

The U.S. Supreme Court reasoned that the choice given the jury "would seem inevitably to enhance the risk of an unwarranted conviction" and stated that "[s]uch a risk cannot be tolerated in a case *in which the defendant's life is at stake.*" (Emphasis supplied.) 447 U.S. at 637.

In the present case, the finder of fact was not presented with the "death-penalty-or-acquit" situation in *Beck*. To the contrary, under Nebraska law the issue of guilt or innocence is determined separately from the issue of sentencing. See Neb. Rev. Stat. § 29-2520 (Reissue 1989). Moreover, Masters was not sentenced to death, but to life imprisonment. Thus, the risk which the Court found intolerable in *Beck* is simply not present in Masters' case.

In *Schad*, a defendant was charged in the alternative with premeditated murder and murder in the perpetration of a robbery. The court instructed the jury on the lesser-included offense of second degree murder, but refused the defendant's requested jury instruction on robbery as a lesser-included offense. The defendant was convicted of first degree murder and was sentenced to death by the judge after a further hearing.

One of two issues on appeal to the U.S. Supreme Court was whether the Court's holding in *Beck* mandated an instruction on robbery, which Schad characterized as a lesser-included offense of robbery murder. Schad maintained that *Beck* requires that a jury in a capital case be instructed on every lesser-included noncapital offense supported by the evidence. The Supreme Court disagreed and held that the second degree murder instruction was sufficient to ensure the verdict's reliability.

In neither *Beck* nor *Schad* was it necessary for the Supreme Court to reach the issue of whether manslaughter is a lesser-included offense of felony murder. However, in *Spaziano v. Florida*, 468 U.S. 447, 104 S. Ct. 3154, 82 L. Ed. 2d 340 (1984), the U.S. Supreme Court held that a defendant was not entitled to a lesser-included offense instruction under *Beck* when no lesser-included offense existed.

We find that Masters was not entitled to a lesser-included offense instruction under either *Beck* or *Schad*, there being no lesser-included offenses to felony murder under Nebraska law. Masters' second assignment of error is without merit.

CREDIT FOR TIME SERVED

Finally, Masters contends that he is entitled to credit for the time he was incarcerated prior to sentencing.

Neb. Rev. Stat. § 83-1,106(1) (Cum. Supp. 1992) requires that the trial court give an offender credit against the maximum term and any minimum term for time spent in custody as a result of the criminal charge for which a prison sentence is imposed. However, this court has held that, on being sentenced for life imprisonment upon conviction of first degree murder, a defendant is not entitled to credit for time in custodial detention pending trial and sentence. See *State v. Lynch*, 215 Neb. 528,

340 N.W.2d 128 (1983).

In *Lynch*, we explained that the purpose of credit under § 83-1,106

> is to avoid the situation where one convicted of a crime is incarcerated for a period greater than the maximum term of years prescribed as punishment for the particular offense. . . . By its very nature [a life] sentence is indefinite. . . . In the case of a life sentence, it is impossible to impose punishment exceeding the term prescribed by statute.

215 Neb. at 537, 340 N.W.2d at 134.

Had Masters received only a life sentence, he would not be entitled to time served. However, because Masters also received a consecutive sentence of $6\frac{1}{3}$ to 20 years on his firearm conviction, a sentence with a maximum and minimum term, he is entitled to credit against that sentence for time he served prior to sentencing. Accordingly, we affirm both of Masters' sentences but remand the cause to the district court with direction to credit Masters' firearm sentence with the amount of time he served prior to sentencing.

## CONCLUSION

There being no merit to Masters' first two assignments of error, his convictions for first degree felony murder and for use of a firearm in the commission of a felony are affirmed. Masters' sentences are affirmed, but the cause is remanded to the district court with direction to give Masters credit for time he served prior to his sentencing on his firearm conviction.

AFFIRMED AND REMANDED WITH DIRECTION.